AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

| | |
|---|---|
| National Oilwell Varco, LP<br>*Plaintiff*<br>v.<br>Black Diamond Oilfield Rentals, LLC; Basin Holdings, LLC; and Basin Energy, LLC<br>*Defendant* | Civil Action No. CIV-24-1258-D |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Gagemaker, LP, 712 East Southmore Avenue, Pasadena, TX 77502

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit "1" attached hereto.

| | |
|---|---|
| Place: Documents may be produced by you electronically or, alternatively, NOV will pick up responsive documents from your office at the address listed above. | Date and Time: @<br>07/11/2025 [redacted] 12pm (CT) |

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 6/16/25

*CLERK OF COURT*

_________________________ OR _________________________

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ____________ , who issues or requests this subpoena, are:

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. CIV-24-1258-D

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* __________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________
______________________________________________________________
______________________________ on *(date)* __________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ __________ .

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: __________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## I. DEFINITIONS

**1.** Wherever the words "Gagemaker" or "you," or "your" or any pronoun referring to Gagemaker, LP appear, the same shall be taken to refer not only to Gagemaker, LP, 712 E. Southmore Avenue, Pasadena, TX 77502, but also James R. "Jim" Douglas, and its employees, agents, investigators, representatives, vendors, and independent contractors.

**2.** "Affiliate," an "Affiliate" of, or person "Affiliated" with, a specified person shall mean a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified. [This is the definition set forth in Rule 405 promulgated by the Securities and Exchange Commission under the Securities Act of 1933].

**3.** "Black Diamond" as used herein shall mean Black Diamond Oilfield Rentals, LLC.

**4.** "Communication" as used in this request, means any oral statement, dialogue, discussion or conversation, and also means any transfer of thoughts or ideas between persons by means of documents, and includes any transfer of data from one location to another by electronic or similar means (**including, but not limited to, emails, text messages, etc.**).

**5.** "Second Am. Complaint" as used herein shall mean the Second Amended Complaint filed by Plaintiff in the above-captioned lawsuit, Doc. No. 59, and enclosed herewith as *Exhibit 2*.

**6.** "Document" shall include every kind of physical representation or recording of communication or data, including without limitation, electronic documents (**including, but not limited to, emails, text messages, etc.**), all materials and tangible objects conveying or carrying any kind of meaning, whether in graphic form for visual inspection or in machine readable form, including film, microfilm, magnetic or other visual sound recordings, and/or videotapes, however

produced or reproduced, including originals, if available, copies and drafts, and the files in which documents are maintained, and regardless of whether signed, approved, executed, sent, received, erased or otherwise altered.

**7.** "EVRDRL" shall be defined as set forth in the Second Am. Complaint at ¶ 53, inclusive of all connection sizes (3.90, etc.).

**8.** "FPI" as used herein shall mean Fearnley Proctor Inc.

**9.** "Identify," "identity, or "identification":

**a.** When used in reference to a natural person, requires statements of the person's full name, last known home and business address, home and business telephone numbers, and present business affiliation and position.

**b.** When used with reference to a document, these terms require the title or character of the document (such as "letter" "memorandum," etc.); the author and every person signing the document; every recipient of the document; the date the document was prepared, executed and transmitted; a description of the general subject matter of the document; and the identification of every person in whose custody the document is now being kept. At your option, complete and legible copies of any document may be attached to your responses to these Requests and appropriately labeled to correspond to the Request to which it is being produced.

**c.** When used in reference to a meeting, conference, conversation or other communication, these terms require statement of the date and time, the identification of each person involved and the location of each party to the conference or communication at the time it took place.

**10.** "Jack Smith" as used herein shall mean Jackie E. Smith a/k/a Jack Smith of Wildbrook

Engineering PLLC, and the person who said to have authored the Wickander Engineering Report.

**11.** "Jim Douglas" as used herein shall mean James R. "Jim" Douglas, who helped Jack Smith and Precision prepare and create the EVRDRL connection at the request of Black Diamond.

**12.** "Kibbe" as used herein shall mean Charlie Kibbe, P.C., of Precision Engineering Solutions.

**13.** "Last Known Address" shall mean the last physical address in your file for the referenced individual.

**14.** "Nels Wickander" as used herein shall mean Nels Wickander of Wickander and Associates, Inc.

**15.** "NOV" as used herein shall mean National Oilwell Varco, L.P., inclusive of Grant Prideco.

**16.** "Precision" as used herein shall mean Precision Engineering Solutions, 7805 Highway 90 W, New Iberia, LA, 70560.

**17.** The "*Snider* Litigation" as used herein shall mean *Snider v. Cactus Drilling Company, LLC, et al.*, Grady County (OK) District Court Case No. CJ-2023-7.

**18.** "Wildbrook" as used herein shall mean Wildbrook Engineering PLLC, 25615 Wildbrook Crossing Ln., Katy, TX 77494.

**19.** "Wickander" as used herein shall mean Wickander and Associates, Inc., 13618 Poplar Circle, Ste. 302, Conroe, TX 77304.

**20.** "Wickander Engineering Report" as used herein shall mean the report entitled "Interchangeability and Compatibility Tests. Evrdrl 3.90 and XT39™ Connections" dated 4/30/2020.

**21.** "XT®" as used herein shall be defined per the Second Am. Complaint at ¶ 15.

## II. CATEGORIES OF PRODUCTION

**1.** From 2018 to present and continuing, produce all communications between Gagemaker and Wildbrook touching or concerning the design of the EVRDRL connection, including preparing and completing the prints, as well as all documents or dimensions utilized or relied upon in connection therewith.

**2.** From 2018 to present and continuing, produce all communications between Gagemaker and Wickander touching or concerning the design of the EVRDRL connection, including preparing and completing the prints, as well as all documents or dimensions utilized or relied upon in connection therewith.

**3.** From 2018 to present and continuing, produce all communications between Gagemaker and Jack Smith touching or concerning the design of the EVRDRL connection, including preparing and completing the prints, as well as all documents or dimensions utilized or relied upon in connection therewith.

**4.** From 2018 to present and continuing, produce all communications between Gagemaker and Kibbe touching or concerning the design of the EVRDRL connection, including preparing and completing the prints, as well as all documents or dimensions utilized or relied upon in connection therewith.

**5.** From 2018 to present and continuing, produce all communications between Gagemaker and Jim Douglas touching or concerning the design of the EVRDRL connection, including preparing and completing the prints, as well as all documents or dimensions utilized or relied upon in connection therewith.

**6.** From 2018 to present and continuing, produce all communications between

Gagemaker and FPI touching or concerning the design of the EVRDRL connection, including preparing and completing the prints, as well as all documents or dimensions utilized or relied upon in connection therewith.

**7.** From 2018 to present and continuing, produce all communications between Gagemaker and Wildbrook touching or concerning the Wickander Engineering Report.

**8.** From 2018 to present and continuing, produce all communications between Gagemaker and Wickander touching or concerning the Wickander Engineering Report.

**9.** From 2018 to present and continuing, produce all communications between Gagemaker and Jack Smith touching or concerning the Wickander Engineering Report.

**10.** From 2018 to present and continuing, produce all communications between Gagemaker and Kibbe touching or concerning the Wickander Engineering Report.

**11.** From 2018 to present and continuing, produce all communications between Gagemaker and FPI touching or concerning the Wickander Engineering Report.

**12.** From 2018 to present and continuing, produce all communications between Gagemaker and Wildbrook touching or concerning XT®, the XT® patent, or the XT® trademark.

**13.** From 2018 to present and continuing, produce all communications between Gagemaker and Wickander touching or concerning XT®, the XT® patent, or the XT® trademark.

**14.** From 2018 to present and continuing, produce all communications between Gagemaker and Jack Smith touching or concerning XT®, the XT® patent, or the XT® trademark.

**15.** From 2018 to present and continuing, produce all communications between Gagemaker and Kibbe touching or concerning XT®, the XT® patent, or the XT® trademark.

**16.** From 2018 to present and continuing, produce all communications between

Gagemaker and FPI touching or concerning XT®, the XT® patent, or the XT® trademark.

**17.** From 2018 to present and continuing, produce all communications between Gagemaker and Wildbrook touching or concerning the *Snider* Litigation.

**18.** From 2018 to present and continuing, produce all communications between Gagemaker and Wickander touching or concerning the *Snider* Litigation.

**19.** From 2018 to present and continuing, produce all communications between Gagemaker and Jack Smith touching or concerning the *Snider* Litigation.

**20.** From 2018 to present and continuing, produce all communications between Gagemaker and Kibbe touching or concerning the *Snider* Litigation.

**21.** From 2018 to present and continuing, produce all communications between Gagemaker and FPI touching or concerning the *Snider* Litigation.

**22.** Produce your company's internal definitions of "interchangeable" and "interchangeability." If the definition(s) have changed over time, all previous definition(s) as well as the current definition(s).

**23.** Produce your company's internal definitions of "compatible" and "compatibility." If the definition(s) have changed over time, all previous definition(s) as well as the current definition(s).

**24.** Produce all documents, communications, and things in your possession, custody or control that contain NOV's proprietary and confidential information.

**25.** Make available for inspection on a mutually agreeable date and time within the next 30 days any devices and/or tools that are proprietary to NOV including, without limitation, gauges.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| NATIONAL OILWELL VARCO, L.P.,<br>a Delaware limited partnership,<br><br>Plaintiff,<br><br>v.<br><br>BLACK DIAMOND OILFIELD RENTALS, LLC, a Delaware limited liability company, BASIN HOLDINGS, LLC, a Delaware limited liability company, and BASIN ENERGY LLC, a Delaware limited liability company,<br><br>Defendants. | ) | Case No. CIV-24-1258-D |

**SECOND AMENDED COMPLAINT**

**COMES NOW** National Oilwell Varco, L.P. ("NOV" or "Plaintiff") and hereby files its Second Amended Complaint, as permitted by the Court. *See* Doc. No. 58. For its claims against Black Diamond Oilfield Rentals, LLC ("Black Diamond"), Basin Holdings, LLC ("Basin Holdings"), and Basin Energy, LLC ("Basin Energy") (collectively, "Basin Holdings" and "Basin Energy" are referred to herein as "Basin"), collectively the "Defendants," NOV hereby alleges and states the following:

## I. PARTIES, JURISDICTION & VENUE

**1.** NOV is a limited partnership organized and existing under the laws of Delaware and with its principal place of business in Houston, Texas.

**2.** Black Diamond is a limited liability company organized and existing under the laws of Delaware and with its principal place of business in Houston, Texas.

EXHIBIT
2

**3.** Basin Holdings is a limited liability company organized and existing under the laws of Delaware and with its principal place of business in New York City, New York.

**4.** Basin Energy is a limited liability company organized and existing under the laws of Delaware and with its principal place of business in New York City, New York.

**5.** This Court has personal jurisdiction over Basin, the parent corporations and/or affiliates of Black Diamond, by virtue of Basin specifically directing Black Diamond to exploit the Oklahoma oil and gas market by supplying oilfield drill pipe to oil companies and drillers located, and/or drilling and exploring for hydrocarbons, in the State of Oklahoma. For example, Basin directed Black Diamond to assign salesperson(s) to market drill pipe in the State of Oklahoma; develop relationships with logistically necessary third parties in the State of Oklahoma including, without limitation, pipe yards, pipe inspectors, machinists, and transportation companies. Thus, Basin purposefully availed itself of the privilege of conducting business in the State of Oklahoma, by and through its pervasive control of Black Diamond.

**6.** Alternatively, this Court has personal jurisdiction over Basin as the alter ego of Black Diamond. Specifically, **(1)** Basin owns a majority of Black Diamond's stock; **(2)** Chris Biggerstaff, the President of Black Diamond, is also on the Executive Management Team for Basin; **(3)** Basin provides and/or arranges financing to Black Diamond, either directly, indirectly through affiliates like Basin Finance and/or Basin Industries, or through Basin's third party lending relationships;[1] **(4)** upon information and belief, Black Diamond

[1] *See*, *e.g.*, https://www.stephens.com/investment-banking/transactions/basin-industries-llc (describing how Basin Industries secured an "Asset-based Revolver & Senior Secured

is undercapitalized and/or underinsured, particularly with respect to the claims asserted herein by NOV, largely because Basin deliberately charges Black Diamond costs, management fees, and intercompany financing charges that are commercially unreasonable and not negotiated at arm's length, depleting Black Diamond's capitalization and corresponding equity position;[2] **(5)** upon information and belief, Basin pays the salaries, expenses, and/or losses of Black Diamond, either directly or indirectly through an affiliate called Basin Finance; **(6)** Black Diamond is considered an affiliate, or "portfolio" company of Basin;[3] and **(7)** the officers and directors of Black Diamond are required to follow the directives of Basin, who – by design – always compromises a majority vote of the Board. Finally, but critically, and specific to this action, Basin has used and organized Black Diamond as a commercial vehicle to **(i)** infringe upon the protected XT® trademark of NOV, and **(ii)** deceive oil and gas companies into believing that Black Diamond's bootlegged competitor product was "interchangeable" with NOV's superior product,

---

Term Loan, with aggregate commitments of $33 million" on or about 7/20/2022, which "was raised across two of the Company's business units[,]" including Black Diamond) (access 5/10/2025); and https://www.fgiww.com/stories/fgi-provides-15mm-asset-based-revolver-for-basin-industries-llc/ (describing how Basin Industries secured a "15MM Asset-Based Revolver" from FGI Finance and that Black Diamond was one "of the Company's main business units" involved with the financing) (accessed 5/10/2025).

[2] [redacted]

[3] Indeed, to meet the definition of "eligible portfolio company" under federal law, an entity like Black Diamond must be "controlled by a business development company, either alone or as part of a group acting together, and such business development company in fact exercises a controlling influence over the management or policies of such eligible portfolio company and, as a result of such control, has an affiliated person who is a director of such eligible portfolio company[.]" 15 U.S.C.A. § 80a-2.

creating confusion in the associated marketplace. Unless Basin's separate existence is disregarded, Basin's inequitable conduct will be rewarded and NOV's rights will not be protected, resulting in substantial injustice.

**7.** This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over all other claims asserted herein pursuant to 28 U.S.C. § 1367(a).

**8.** Venue is proper in this Judicial District because a substantial part of the events or omissions giving rise to NOV's claims against Black Diamond occurred in this Judicial District.

## II. FACTS

**9.** NOV repleads and incorporates in full paragraphs 1-8 above.

### NOV's Acquisition of Grant Prideco

**10.** Grant Prideco started, in part, as the Grant Supply Company, which was founded in 1960 by engineer Charles Grant in Tulsa, Oklahoma. Grant Supply Company was a distributor of drill pipe, valves, fittings, and other equipment to oil companies.

**11.** Over the next 50 years, that small Tulsa company grew to become a global manufacturing powerhouse in oilfield equipment and tubulars. By 2004, Grant Prideco and its subsidiaries operated nearly 22 manufacturing facilities across North America, Europe, and Asia.

**12.** Grant Prideco was subsequently acquired by NOV. At the time of the acquisition, Grant Prideco operated 25 manufacturing sites worldwide and held approximately 60-percent of the global market-share for drill pipe.

**13.** “Drill pipe” is generally defined to mean “[t]ubular steel conduit fitted with special threaded ends called tool joints.” *See* https://glossary.slb.com/en/terms/d/drillpipe (accessed 10/30/2024). Drill pipe “connects the rig surface equipment with the bottomhole assembly and the bit, both to pump drilling fluid to the bit and to be able to raise, lower and rotate the bottomhole assembly and bit.” *Id.*[4]

**The Grant Prideco™ eXtreme Torque (XT®) Connection**

**14.** One of the most crucial components of drill pipe is the “special threaded end,” or “connection,” which helps transfer torque to the drill bit while withstanding immense rotational stress, axial loads, and other mechanical stresses during drilling operations.

**15.** In 1997, Grant Prideco applied for the first patent for the pipe connection and tool joint that Grant Prideco markets and sells as the eXtreme Torque (XT®) connection (hereafter, “XT®”), which was subsequently issued by the United States Patent and Trademark Office (“USPTO”) in 1999. *See* U.S. Patent No. 5,908,212. Below is an illustration of an XT® connection:

**[Remainder of Page Intentionally Blank]**

[4] The “bottomhole assembly” is the lower portion of a drill string, generally understood to include “the bit, bit sub, a mud motor (in certain cases), stabilizers, drill collar, heavy-weight drillpipe, jarring devices (‘jars’), and crossovers for various threadforms.” *See* https://glossary.slb.com/en/terms/b/bottomhole_assembly (accessed 10/30/2024).

Case 5:24-cv-01258-D Document 59 Filed 05/21/25 Page 6 of 48



*See* https://www.nov.com/-/media/nov/files/products/wbt/grant-prideco/xt-connections/xt-extreme-torque-connections-flyer.pdf (accessed 10/30/2024).

**16.** Grant Prideco developed the XT® tool joint connection in response to increased complexity in drilling operations (on- and off-shore), particularly with the arrival of horizontal drilling. Horizontal drilling enabled operators to drill longer and deeper wells, increasing hydrocarbon recovery but also placing enhanced drilling stresses on tool joints.

**17.** Grant Prideco recognized the need to develop the next generation of tool joint connections that could tolerate the stresses of complex drilling operations while remaining user friendly for rig crews, particularly during the "make-up" (*i.e.*, connection) process at the beginning, as well as the "break out" (*i.e.*, disconnection) process at the end. Drill pipe that is difficult to either make-up or break out creates inefficiencies that become cost-prohibitive during drilling operations.

**18.** At the time Grant Prideco was developing the XT® connection, most drill pipe connections were "single" shoulder connections, more commonly known as "API connections."[5] On a single shoulder connection, the "male" part of the tool joint – *i.e.*, the tapered, threaded end of drill pipe – stopped where the thread stopped, which left a gap when the tool joint was "made up," or connected with, the "female" end of drill pipe. The gap existed due to the lack of additional material, meaning single-shoulder drill pipe was less efficient at transferring higher torque throughout the drill string.

**19.** Unlike a single shoulder API connection, the XT® connection was designed by Grant Prideco with a "double" shoulder, which eliminated the "gap" described above, creating a connection with the ability to withstand higher torque, and improved longevity in the field.

**20.** Just as significantly, Grant Prideco developed the XT® connection with a proprietary thread profile, described as follows:

> **Proprietary Thread Profile**
> XT connections have a proprietary thread design with a larger root radius to maintain higher fatigue resistance than API connections, even at increased operational torque. Cold-rolled threads further enhance their ability to resist fatigue.

*See* https://www.nov.com/-/media/nov/files/products/wbt/grant-prideco/xt-connections/xt-extreme-torque-connections-flyer.pdf (accessed 10/30/2024).

**21.** In turn, Grant Prideco's design of the XT® connection created a tool joint that optimized torque and hydraulics during drilling operations.

[5] "API" is an acronym for the American Petroleum Institute.

**22.** Torque is imperative during drilling operations to penetrate greater depths and access more challenging hydrocarbons, often only achievable using bigger, strong rigs. Such rigs put significantly more pressure on drill pipe, requiring connections that can withstand the added stress over extended periods of time.

**23.** Hydraulics are equally crucial during drilling. During drilling, mud and other fluids are pumped down the drill string and all the way to the bit. After exiting the bit, mud and other fluids are designed to flow back out the drill string through the annulus of the well,[6] which helps maintain temperature during drilling operations by lubricating and cooling the friction between the wellbore and the drill pipe, as well as returning the cuttings to surface.

**24.** Thicker, less-streamlined drill pipe – though able to withstand higher torque equivalent to that of XT® during drilling – often resulted in poor well hydraulics.

**25.** The XT® connection was revolutionary because it had a more streamlined (*i.e.*, thinner) tool joint – despite the added metal from the double shoulder connection – which improved hydraulics as mud and other fluids flowed back through the annulus (by creating more space) even during the most demanding drilling operations, but was still designed to handle the demanding stresses of drilling complex wells using high torque, as explained by NOV:

---

[6] Defined as "[t]he space between two concentric objects, such as between the wellbore and casing or between casing and tubing, where fluid can flow." *See* https://glossary.slb.com/en/terms/a/annulus (accessed 10/30/2024).

## Torque optimized

The XT connection is designed to deliver a higher torque rating than first-generation double-shouldered connections. Even in a more streamlined configuration, XT provides 70% more torque than API connections of comparable dimensions. This additional strength meets the required torque for drilling extended reach or in more performance-demanding environments.

## Streamlined for performance

The XT connection's increased torsional strength enables tool joint dimensional optimization that is more aligned with the pipe body torsional strength. It can be configured with a smaller OD and larger ID without sacrificing torsional capacity, which contributes to improved drill string hydraulics. XT connections facilitate the use of larger drill pipe in a set hole size, such as 5⅞ in. drill pipe with XT 57 in an 8½ in. hole size. This provides improved hydraulic efficiency, better hole cleaning, and greater buckling strength without compromising torsional strength or fishability.

**Benefits**

- 70% more torque than API
- Improved hydraulics (up to 50% reduction of internal pressure loss)
- Enhanced buckling resistance
- True flush ID for better tool running

*See* https://www.nov.com/products/xt-connections (accessed 10/31/2024).

**XT® Proprietary Thread Profile and Licensee Network**

**26.** All of this was made possible because of the proprietary thread profile for the XT® connection. Without the proprietary thread profile, the XT® technology would not have become the gold standard when drilling the most demanding wells in the world.

**27.** NOV has established valuable trademark rights in the U.S. and significant goodwill among U.S. and international consumers, in the XT® mark by virtue of its long-standing use of the same in commerce.

**28.** NOV's use of the XT® mark has resulted in substantial sales of drill pipe and drill pipe connections sold under the XT® mark.

**29.** As a result of NOV's long-standing use of the XT® mark, and its substantial investment of resources in advertising and promoting the XT® mark over time, the XT® mark has achieved widespread recognition and distinctiveness among the oil and gas industry, to the point where those within the industry—including industry leaders and executives—now use the term XT® to refer to NOV's drill pipe and drill pipe connections.

**30.** NOV owns a valid and subsisting United States trademark registration for its XT® mark:

| **Mark** | **Ser. No** | **Reg. No.** | **Goods/Services (Date of First Use)** |
|---|---|---|---|
| XT | 75623469<br><br>(App. Date: Jan. 18, 1999) | 2,466,236<br><br>(Reg. Date: July 3, 2001) | IC 006. Threaded metal drill pipe connections used on metal drill pipe for the drilling of oil and gas well and other earth boreholes (May 3, 1998) |

A true and correct copy of the trademark registration for Registration No. 2,466,236 is attached hereto as *Ex. 1*. Originally, the U.S. trademark for XT® was filed in the name of Grant Prideco, Inc. In 2004, a name change was recorded, moving ownership of the XT® trademark from Grant Prideco, Inc. to Grant Prideco, L.P. Due to the merger of Grant Prideco, L.P. into National Oilwell Varco, L.P. on December 31, 2021, the XT® trademark is now owned by National Oilwell Varco, L.P. The associated merger documentation was recorded in May of 2023.

**31.** In approximately 2017, the patent covering the drill pipe and connections sold under the XT® brand expired.

**32.** Though the patent covering the drill pipe and connections sold under the XT® brand expired, the proprietary nature of the XT® thread profile remained intact. The XT® thread profile is proprietary because only NOV and its worldwide network of licensees have access to the thread details drawings, controlled proprietary gauges (which are distinct and different from API gauges), tooling, and quality control procedures necessary to supply genuine XT® connections.

**33.** Relatedly, NOV licensees must meet NOV's technical licensee standards and remain qualified under those standards. NOV ensures such standards are met by requiring a prospective facility to demonstrate its competency through NOV-approved proficiency metrics in repair performance, including the ability to cut or re-cut NOV's proprietary threads like XT®.

**34.** Further, to ensure NOV's standards are met after a facility obtains its license, NOV regularly and comprehensively audits its approved licensees. NOV customers in need of post-purchase repairs agree to use only NOV-approved licensees. For that reason, NOV provides customers with an expansive licensee network to ensure maximum quality control, particularly regarding the repair of the proprietary thread profiles on drill pipe with XT® connections. *See* https://www.nov.com/products/grant-prideco-licensee-network (accessed 10/30/2024). When NOV acquired Grant Prideco in 2008, it acquired proven brands like XT® as well as this worldwide licensee network.

**35.** And while the XT® patent expired in approximately 2017, the XT® trademark has not expired. Indeed, it is the XT® trademark that assures operators and drillers they can trust the quality of connection being used to drill the most demanding oil

and gas wells in the world – all without sacrificing the safety of their rig crews. That is, until Black Diamond came along.

**Black Diamond and Basin**

**36.** On or about July 18, 2012, Black Diamond was organized by Basin Rentals, Inc., a predecessor of Basin, who became the "Organizational Member" of Black Diamond. *See* Limited Liability Company Agreement of Black Diamond Oilfield Rentals, LLC at p. 1 (Black Diamond 036126). As the Organizational Member, Basin Rentals, Inc. was the "sole member" of Black Diamond, holding 100-percent (100.00%) of Black Diamond's membership interest and entitling it to receive "all distributions" made by Black Diamond. *Id*. Furthermore, the management of Black Diamond was "fully reserved" to Basin Rentals, Inc., as the Organizational Member. *Id*. at p. 2 (Black Diamond 036127). John B. Fitzgibbons ("Fitzgibbons") was the President of Basin Rentals, Inc. *Id*. at p. 4 (Black Diamond 036129).[7]

**37.** Basin did not set out to "start" Black Diamond. Instead,

> Plaintiff Robert Gibbens signed an employment contract with Quality Rental Tools ("QRT"), an oilfield tool rental company based in Houma, Louisiana, in September 2005. Frank Clements, the sole owner and shareholder for QRT, ran the day-to-day business of the company. QRT has an inventory of oil field tools that it rents out to various oil companies; QRT also employs salesman to negotiate the rentals.
>
> Over the course of Gibbens' time with the company, QRT began to entertain offers from various suitors to buy the company. In the spring of 2012, Basin Holding, L.L.C. ("Basin"), a company out of New York, expressed its interest in purchasing QRT. In advance of the sale, QRT's financial inventory was taken, projected revenues were perfected, and revenue streams were reckoned. From approximately March to late May 2012, Gibbens, defense

[7] Fitzgibbons is now the Executive Chairman of Basin.

> counsel Gerald deLaunay and Frank Clements—as well as Clements' CPA—were the key figures working to negotiate the deal.
>
> In May 2012, Basin submitted an offer to buy QRT. deLaunay took the lead in evaluating the offer and made a counter offer to Basin. deLaunay formulated and submitted a counter-offer wherein he asserted that while QRT was valued at $21 million, if its debt was taken into account, the company was valued at "$17MM exclusive of the intellectual property and the plant." Because the parties could not agree on a price, the Basin deal fell through. Immediately after the negotiations terminated, Gibbens began secretly negotiating with Basin for the purpose of starting a new business venture to carry out a development project on which Gibbens had been working for QRT for several years. Basin and Gibbens eventually agreed on terms and formed Black Diamond Oilfield Rentals, L.L.C. ("Black Diamond").

*Gibbens v. Quality Rental Tools, Inc.*, No. CIV.A. 13-6401, 2014 WL 5432113, at *1 (E.D. La. Oct. 24, 2014). Restated, to "start" Black Diamond, Basin is alleged to have stolen key personnel from Quail Rental Tools, a drill pipe rental company, after its legitimate acquisition effort described above failed.

**38.** Approximately three (3) months later, on or about October 9, 2012, ***another*** alum of Quail Rental Tools – Chris Biggerstaff – was added as an owner of Black Diamond. *See* Amended and Restated Limited Liability Company Agreement of Black Diamond Oilfield Rentals LLC dated 10/9/2012 (Black Diamond 036132-176). Basin [redacted] gave four (4) Executives, including Biggerstaff and Gibbens, [redacted] ownership interests in Black Diamond. *Id.* at ¶ 3.3(b) (Black Diamond 036142). The consideration for Biggerstaff and Gibbens' minority ownership interests was described to be the "prior performance of consulting services" for Black Diamond, suggesting they had been scheming with Basin for quite some time. *Id.* at ¶ 3.3(c).

**39.** Though owners and executives have been added over the years, including to the Board of Directors, Basin has always retained the ability to exclusively control and manage Black Diamond. *See* Amended and Restated Limited Liability Company Agreement of Black Diamond Oilfield Rentals LLC dated 10/9/2012 at ¶ 2.6(a) [redacted] Second Amended and Restated Limited Liability Company Agreement of Black Diamond Oilfield Rentals LLC dated 2/11/2014 at ¶ 2.6(a) (Black Diamond 036183) (same); Third Amended and Restated Limited Liability Company Agreement of Black Diamond Oilfield Rentals LLC dated 12/31/2018 at ¶ 2.6(a) (Black Diamond 036239) (same); Fourth Amended and Restated Limited Liability Company Agreement of Black Diamond Oilfield Rentals LLC dated 7/31/2021 at ¶ 2.6(a) (Black Diamond 036304) (same); and Fifth Amended and Restated Limited Liability Company Agreement of Black Diamond Oilfield Rentals LLC dated 3/31/2023 at ¶ 2.6(a) (Black Diamond 023080) (same).

**40.** Basin exercised its managerial control over nearly every facet of Black Diamond's day to day business, including by way of the Basin Holdings Code of Conduct (the "Basin Code of Conduct") and Black Diamond Employee Handbook (Manual) (the "Employee Handbook"), which was prepared by Jamie Weaver, the Vice President of Human Relations at Basin Holdings.

**41.** Among other things, the Code of Conduct required Black Diamond employees to consult with Basin's Legal Department when appropriate. *See* Basin Code of Conduct (2022) at 002254 [redacted] at 002255 [redacted] at 002257 [redacted] Material here, Black Diamond's development and prosecution of the EVRDRL patent – a bootlegged version of XT®, as explained *infra* – was led by Basin's legal team, as required.

**42.** Just as significant, the Employee Handbook – again, promulgated by Basin – required Black Diamond employees to respect "Intellectual Property Rights," including rights held by third parties like NOV, as excerpted below:

> 7.4.7 Respecting the Intellectual Property Rights
>
> Although the intranet is an informal internal communications environment, the laws for copyrights, patents, and trademarks still apply. Users may post material to the intranet only after using the following steps:
>
> A. If material to be posted originates outside the Company, written permission from the source must be obtained, and the source must be given adequate credit.
> B. If copyright infringement, confidential information disclosure, libel, defamation of character, or other possible legal issues could be involved, the Company's legal counsel must approve the posting.
> C. Users must independently confirm the material's accuracy, timeliness, and relevance to Company business.
> D. All postings related to the business must be approved by an elevated manager.
> E. Before being posted on the intranet, all web pages must be tested for security and operational problems by a web master.

**43.** Basin imposed similar requirements on Black Diamond by way of its Network Use and Security Policy, as excerpted below:

**Respecting Intellectual Property Rights**
Although the intranet is an informal internal communications environment, the laws for copyrights, patents, and trademarks still apply. Users may post material to the intranet only after using the following steps:

- If material to be posted originates outside BASIN, written permission from the source must be obtained, and the source must be given adequate credit.
- If copyright infringement, confidential information disclosure, libel, defamation of character, or other possible legal issues could be involved, BASIN legal counsel must approve the posting.
- Users must independently confirm the material's accuracy, timeliness, and relevance to BASIN business.
- All postings related to the business must be approved by an elevated manager.
- Before being posted on the intranet, all web pages must be tested for security and operational problems by a web master.

**44.** Since inception, Black Diamond has specialized in the rental of drill pipe.

**45.** Upon information and belief, Biggerstaff was tapped by Basin Holdings – and given a lucrative executive management position – because of his extensive experience selling drill pipe in some of the most profitable basins in the United States. *See* https://basinholdings.com/Management/ (identifying Mr. Biggerstaff as a member of Basin's management team) (accessed 3/1/2025). According to Basin's website,

> Basin is privately held by executive management and non-executive board members. Management teams own equity interests directly in the businesses that they operate. As a result, the interests of the company are fully aligned throughout the enterprise. [Basin] generate[s] incremental earnings through our shared capabilities, harnessing the experience of our leadership to improve efficiency across the Basin platform.

See https://basinholdings.com/about (accessed 3/1/2025). Restated, Basin has always been and remains "fully aligned" with Black Diamond, "generat[ing] incremental earnings" from their "shared capabilities," as well as utilizing its "leadership" to "improve efficiency" within Black Diamond. Thus, by its own admission, Basin is not – and has never been – merely a passive investor in Black Diamond, as shown herein.

**46.** Since capitalizing Black Diamond in 2012, and in addition to revenue distributions at defined intervals, Basin has charged Black Diamond for "Corporate Services Costs" and "Management Fees" arising from "Advisory Services," including services for "developing and implementing corporate and business strategy and planning for [Black Diamond], including plans and programs for improving operating, marketing and financial performance[.]" *See* Advisory Agreement dated 1/1/2017 at ¶ 2 [redacted] (Black Diamond 023063). Such Advisory Services included the development of EVRDRL and its subsequent marketing as XT® or "XT type," as described *infra*. Finally, and because Basin controls Black Diamond, these costs and fees have been and remain commercially unreasonable. With its ever-present majority position on the Black Diamond board, Basin does not negotiate these costs and fees at arm's length, resulting in costs and fees that are higher than market rates, depleting Black Diamond's capitalization and corresponding equity position.

**47.** Further depleting Black Diamond's capital are the mandatory payments to Basin's affiliate, Basin Finance, which Basin requires to be given priority by Black Diamond. *See* Policy Letter #2 at ¶ 8 [redacted] (Black Diamond 036354). Once again, these financing arrangements were not the result of arm's length negotiations, but rather on terms overly favorable to Basin.

**48.** Prior to co-founding Black Diamond using Basin's money, Biggerstaff held high-ranking positions at Quail Rental Tools (January 1997 to June 2005) and Thomas Tools (February 2012 to July 2012).

**49.** Quail Rental Tools is a drill pipe rental company based in Louisiana. Historically, Quail Rental Tools has been and remains one of NOV's best customers and near-exclusive distributors. NOV sells drill pipe to Quail Rental Tools who in turn rents the drill pipe to operators and/or drilling contractors.

**50.** Thomas Tools is also a drill pipe rental company – and was a direct competitor of Quail Tools when Biggerstaff left to work for Thomas Tools.[8] While Thomas Tools sold some NOV drill pipe, it was not an exclusive distributor like Quail Rental Tools.

**51.** During Biggerstaff's time at Quail Rental Tools and Thomas Tools, he became intimately familiar with the XT® brand – including when the patent covering NOV's drill pipe and connections sold under the XT® brand would expire.

**EVRDRL**

**52.** NOV manufactures numerous sizes of XT® connections including XT®-38, XT®-39, XT®-46, XT®-50, XT®-54, XT®-57, and XT®-69. These various types of connections have different configurations, including outer dimensions ("ODs"), inner dimensions ("IDs"), weights, and make-up torques (*i.e.*, "MUTs," or the maximum allowable torque the connection can safely withstand).

[8] Thomas Tools was subsequently acquired by Schlumberger, along with a company called Drilco. Schlumberger later spun off Thomas Tools and Drilco, which both now belong to a company called Wellbore Integrity Solutions.

**53.** Knowing the patent covering NOV's drill pipe and connections sold under the XT® brand was set to expire in 2018-19, Black Diamond – led by Biggerstaff and Basin[9] – began to reverse engineer NOV's drill pipe and connections sold under the XT® brand and create its own, bootlegged drill pipe connection under the moniker "EVRDRL," using a Chinese manufacturer named Hilong. [redacted]

**54.** More disturbingly, Black Diamond retained Mr. Jack Smith, P.E., to help guide the EVRDRL "design." Mr. Smith was ***the*** former NOV engineer who helped develop the XT® patent, which was Black Diamond's motivation for retaining him, according to Mr. Biggerstaff:

> Do you know what Jack Smith's credentials are? Does he have some certificate hanging on his wall?
>
> A So Jack Smith designed the original XT connection at Grant Prideco. He's on the patent.

---

[9] Notably, Mr. Biggerstaff filed multiple federal trademark applications in March and April of 2017 for the use of "EVRDRL," but in-house Basin legal representatives took over the prosecution of those applications in September of 2017.

*See* Depo. Tr of C. Biggerstaff at 55:17-20 *Snider v. Cactus Drilling Company, LLC, et al.*, Grady County (OK) District Court Case No. CJ-2023-7 (the "*Snider* Litigation").

**55.** Thereafter, Black Diamond introduced various types of the EVRDRL drill type connection to the drill pipe market, including the EVRDRL ***3.90*** – a corresponding and deliberately confusing reference to XT®-***39***.

**56.** Once the EVRDRL 3.90 was ready for market, Jeb Hunt – a former salesman with Black Diamond – reported receiving the following directive from Biggerstaff:

Q. All right. Did Mr. Biggerstaff give you instruction to do your job as a salesman of rental tools as to EVRDRL 3.90?
A. To push it as EVRDRL 3.90?
Q. Well, no. First, just what instruction did he give you to go about selling it as a rental tool?
A. It was never to be sold as EVRDRL 3.90.
Q. What was it to be sold as?
A. XT39.

*See* Depo. Tr. of J. Hunt at 98:4-12 (the *Snider* Litigation).

**57.** Thus, Biggerstaff, in the course and scope of his employment with Black Diamond and as an Executive Manager for Basin, instructed his salesman to falsely and deceptively sell Black Diamond's bootlegged product "EVRDRL 3.90" as "XT®-39," which was and remains a registered trademark of NOV (United States Reg. No. 2466236), to oilfield customers, including customers in Oklahoma. *See* Depo. Tr of C. Biggerstaff at 149:16-25, 150:1-6 (testifying, in pertinent part, that "***EVRDRL 3.90 was what we labeled***

***it whenever we designed it. … But as far as our salesmen, they know it as XT-39***.") (the *Snider* Litigation) (emphasis added). Black Diamond has no remorse for this misconduct:

Q Has Black Diamond ever disciplined or corrected Dallas Clark for the way he describes product that Black Diamond rents?
A No, sir.
Q Dallas Clark thought that everything was XT-39 type; whereas Jeb Hunt thought everything of this type ought to be called XT-39. You see the difference; right?
MR. HUCKABY: Form.
A Yes.
Q Does Black Diamond have a formal policy written down somewhere that shows the salesman what is the right thing to call this type of tool connection?
A No, sir.
Q And Black Diamond was not involved ever back while he was there of ever rebuking or correcting Jeb Hunt for dropping the word "type" when he would go to sell rental pipe. Right?
MR. HUCKABY: Form.
A No, sir.
Q You personally are not upset with Jeb today that he would market and sell rental pipe as "XT-39" back when he was in your employ. Is that fair?
MR. HUCKABY: Form.
A No, sir.

*See* Depo. Tr. of C. Biggerstaff at 153:2-25 (the *Snider* Litigation).

**58.** XT® is unique and solely attributable to NOV, by and through its acquisition of Grant Prideco. Mr. Sam Goswick, an engineer for Cactus Drilling Company, LLC, testified as follows in the *Snider* Litigation when asked about the uniqueness of XT®:

Q What is -- XT 39 is a trademark of NOV, is
that your understanding, or Grant Prideco?
**A It is.**
Q What does -- now, I've heard some
testimony in this case that the term "XT 39" is
kind of like kleenex in that, you know, someone
says kleenex, they don't necessarily want Kleenex
brand kleenex, they just want a piece of tissue to
wipe their nose, and that it could be made by
anybody. Is that consistent with how you -- how
you refer to XT 39?
MR. HUCKABY: Form.
**THE WITNESS: No.**
Q (By Mr. Streich) Okay. When you refer to
XT 39, are you referring to a specific type of
connection or manufacturer?
**A Yes.**
Q Okay. When you refer to XT 39, what
specifically do you expect?
**A I expect a tool joint built by Grant**
**Prideco.**

*See* Depo. Transcript of S. Goswick at 88:5-25 (the *Snider* Litigation).

**[Remainder of Page Intentionally Blank]**

**59.** Even Dallas Clark, an owner of Black Diamond,[10] testified during his deposition conducted on May 30, 2024, in the *Snider* Litigation that XT® was unique to NOV:

> Q You understand XT-39 was an NOV trademarked pipe?
> A Yes.

*See* Depo. Transcript of Dallas Clark at 118:11-13 (the *Snider* Litigation).

**60.** Mr. Biggerstaff echoed Mr. Clark's testimony:

> Q Extreme Torque trademark. Do you see that?
> A Yes, sir.
> Q That is Grant Prideco's/NOV's trademark. Right?
> A Yes, sir.

*-and-*

> Q Explain to us what you think a trademark means. What's the benefit of having a registered trademark?
> A Nobody can rob the EVRDRL name.
> Q Can't use it in commerce. Right?
> A Yes, sir.
> Q Same thing would be true with respect to NOV's trademark of their XT-39 connection. Right? It was trademarked. Right?
> MR. HUCKABY: Form.
> A Yes, sir.

*See* Depo. Tr of C. Biggerstaff at 224:20-24 and 255:11-20 (the *Snider* Litigation).

---

[10] *See* Doc. No. 18 (Defendant's Corporate Disclosure Statement).

**61.** Thus, it is widely recognized and acknowledged in the oil and gas industry that XT® is unique to NOV, signifying that the associated drill pipe connection has satisfied NOV's stringent and proprietary manufacturing and/or repair standards.

**Widespread Market Deception by Black Diamond**

**62.** According to Mr. Biggerstaff, ***every*** tool joint containing an EVRDRL connection – even when the customer requested actual XT® – was subsequently marketed and supplied as "XT-39 type":

> The process is: You request the bid. We request it.
> And it's going to have "XT-39 type" on the line item.

*See* Depo. Tr. of C. Biggerstaff at 155:2-3 (the *Snider* Litigation).

**63.** Black Diamond did not limit its deception to the EVRDRL 3.90 product line or to the act of selling new EVRDRL drill pipe as XT®.

**64.** Sometimes, Black Diamond would recut an XT® tool joint as EVRDRL using a captive repair vendor, even though neither Black Diamond nor the vendor was an NOV licensee. Rather than tell the customer the tool joint was recut (*i.e.*, repaired) to Black Diamond's bootlegged connection, Black Diamond deceived customers into believing the XT® tool joint was recut to XT® specs (again, despite neither being an NOV licensee nor using an NOV-licensed facility).

**65.** For example, Black Diamond included the "XT" moniker on one of its "Drill Pipe Performance Data Sheets," as depicted below:


BLACK DIAMOND

HOUSTON
9595 Six Pines Drive
The Woodlands, TX 77380
P: (281) 443-0062
www.bdoilfield.com

OKLAHOMA CITY
100 S. Cooley Dr.
Oklahoma City, OK 73127
P: (405) 538-5885

NEW IBERIA
516 Iberia Parkway
New Iberia, LA 70563
P: (337) 358-1994

MIDLAND
2007 Wester Road
Midland, TX 79706
P: (432) 089-6076

DRILL PIPE PERFORMANCE DATA SHEET ©

2019 Version 02.28.19 -Engineering Release

LANDING STRING RATED CAPACITY = 916,254 lbs
BASED ON SLIP CRUSHING CAPACITY
FOR 16.5" SLIPS LENGTH & 4.2 K-FACTOR

Pipe Size and Weight: 5-7/8" 0.625"wt IEU
Pipe Grade: S-135
Range: 2
Tool Joint: 7.063 X 4.000 XT57

(referencing the “XT57” tool joint).

**66.** After problems with this drill pipe were flagged by a confused customer (and thereafter an equally confused NOV, who had no record of selling the drill pipe), Mr. Nelson Allen, the then-Vice President of Marketing and Sales Services for NOV, sent the following correspondence to Biggerstaff of Black Diamond:


Please remove all references to XT™ from your performance sheets.
We don't support claims of interchangeability, we prefer Black Diamond completely avoid the usage of any Grant Prideco Trade Marks on Black Diamond literature, however, if you insist on using our marks they must be used correctly and attributed to Grant Prideco. We do not want our name or mark used in claims of interchangeability.
Thank you

G, please inform Borr this is not our product and we do not stand behind any of the calculations or claims.
Regards
Nelson

**Want to know more about our new H2Shield™ 135 MS grade?**
New H2Shield™ Sour Service Grades | *95 KSI to 135 KSI Application Specific Grades*
https://www.nov.com/products/sour-service-products
Nelson F. Allen | *Vice President Marketing and Sales Services*

Grant Prideco
NOV Wellbore Technologies
10100 Houston Oaks Drive | Houston, Texas 77064, USA
T +1 281-921-3616
M +1 713-894-0374
E nelson.allen@nov.com

**67.** On July 30, 2020, NOV formally warned Black Diamond about infringing on NOV's trademarks on Black Diamond's website:

**[Remainder of Page Intentionally Blank]**

**Re: NATIONAL OILWELL VARCO and GRANT PRIDECO Trademarks**

Dear Mr. Biggerstaff,

I am contacting you on behalf of National Oilwell Varco (NOV) and its affiliate Grant Prideco (GP). NOV and GP are leading global providers of products and services to companies in the oil and gas industry. For as long as twenty years in some cases, NOV and GP, through and in conjunction with its affiliates, use the following marks (collectively referred to herein as the "GP Marks") in connection with the sale of drill pipe, heavy weight drill pipe (HWDP) and threaded connections for drill stem products:

- HI TORQUE®
- HT™
- EXTREME®
- XT®
- SPIRAL-WATE®
- TRI-SPIRAL®
- Z140™
- V150™

The GP Marks are protected by Federal registrations and by common law. For example:

- US Registration number 3671768 for HI TORQUE
- US Registration number 2443230 for EXTREME
- US Registration number 2466236 for XT
- US Registration number 1248819 for SPIRAL-WATE
- US Registration number 3765460 for TRI-SPIRAL

In addition, through extensive and continuous use, NOV and GP have acquired common law rights to the marks HT, Z140 and V150.

NOV and GP have secured and maintained its trademark rights through great effort, care, and expense. Using the GP Marks, NOV and GP have extensively advertised and promoted its highly regarded drill pipe, HWDP, and connections. As a direct result of its commitment to maintaining the highest standards of quality and customer satisfaction, as well as the proven desirability of its products, NOV and GP have developed extensive and valuable goodwill in the GP Marks, such Marks becoming well known and widely recognized as symbolizing drill pipe and connectors of the highest quality.

NOV recently learned that Black Diamond (BD) is using and displaying the HT, EXTREME, XT, SPIRAL-WATE, TRI-SPIRAL, Z140 and V150 marks at https://www.bdoilfield.com/Products-Equipment. BD is also using a phonetically equivalent version of the GP Mark HI TORQUE at the same webpage (i.e., High Torque).

Because the BD terms and the GP Marks are used on identical products, and because the products are sold into the same industry to the same customers, there is a high likelihood of confusion created by BD's use of the marks. Specifically, BD's use and promotion of its own drill pipe products and connections in mixed use with GP Marks and GP technologies is likely to cause confusion, or to cause mistake, and/or to deceive consumers as to the affiliation of BD's business with NOV or GP, or as to origin, sponsorship, or approval of BD's goods or commercial activities by NOV or GP.

The purpose of this communication is to expressly notify BD of NOV's and GP's legal rights, and to provide BD with the opportunity to append its designations to avoid confusing potential customers, distributors, and others. NOV is only asking at this time that BD provide clear notice and attribution on its webpage of ownership by GP with respect to the GP Marks, for each instance that the marks or related technologies are referenced, so it will be clear that the drill pipe, HWDP, grades and connections BD is marketing are not made by, sponsored, or endorsed by NOV or GP.

You are asked to respond within ten (10) days of receipt of this letter and provide NOV with your written assurance that BD will make the requested changes to its website and all marketing materials with respect to the marks identified herein.

Please note that this letter does not constitute a complete statement of NOV's rights, and nothing herein shall be construed as a waiver of any right, claim, or cause of action, or defense that NOV may have against you.

Sincerely,
**National Oilwell Varco, L.P., by its general partner,**
**NOW Oilfield Services, LLC**

Matthew Scheele
Managing Intellectual Property Counsel

**68.** The following month, in August of 2020, NOV issued the following bulletin:

**NOV Grant Prideco Statement on Grant Prideco™**

**Proprietary Connection Copies**

**Replaces CM-3.2-2011Jan18-EXT**

National Oilwell Varco (NOV) has registered trademarks for Grant Prideco connection technologies in effect. Grant Prideco Double Shoulder™ (GPDS™), Grant Prideco EIS™, HI TORQUE™ (HT™), eXtreme™ Torque (XT™, XTF™,XT-M™, XT-MF™), Grant Prideco Express™ (VX™), VX-M™,TurboTorque™ (TT™, TT-M™, TF-M™), uLtimate™ series connections (uGPDS™, uXT™), MW™, Nano™, CT-M™, GT-M™, MaXit™, DPR HP™, DC™, SST™, SRT™, and wSeries (wXT™, wTT™, wGPDS™, wDC™) are all registered trademarks of NOV and only Grant Prideco (GP) and its licensees are entitled to use them. "Bootleg" versions or copies of GP's connection technology is not authorized by GP to be sold and cannot be represented as GP's trademarked connections. Any party representing "Bootleg" or copied connection's as genuine GP connections is potentially exposing itself to legal action.

The intellectual property necessary to produce the GP connections is not in the public domain and is proprietary to GP. Only GP and its worldwide network of licensees have access to the thread details drawings, controlled proprietary gauges *(which are distinct and different from API gauges)*, tooling, and quality procedures necessary to supply genuine GP connections. Additionally, to ensure the quality of GP's connections, licensees are provided with GP's technical and engineering support. GP spends considerable time and money in supporting its licensees and ensuring that their workshops are capable of producing the same quality proprietary product obtainable from GP facilities.

> On the other hand, a "bootleg" shop must rely on its ability to copy or recreate the product without the benefit of our drawings, gauges, tooling, dimensions, tolerances, etc. Additionally, the "bootleg shops will not be able to mate their threading working gauges to GP's master gauges to establish proper mating. Because of this, and the fact that the use of unauthorized or illegitimately obtained GP intellectual property is improper, GP encourages its customers to insure they are using authentic GP products and GP emphasizes that it will not accept any liability for the use of "bootlegged" or copied connections.
>
> Any claims of interchangeability made by companies other than GP have NOT been confirmed and are NOT supported by GP. Any liability for failure resulting from these claims of interchangeability shall be the sole responsibility of the company making these claims.
>
> GP strongly advises against obtaining products being sold as GP products or as products which are interchangeable with GP products from facilities that have not been licensed by GP. GP's up to date list of licensees can be obtained from the GP2Go™ app or from the licensee locator on the NOV website.
>
> Mixing genuine GP connections with "bootlegged" or copied ones can result in connection damage and potentially a catastrophic operating failure. Additionally, **the use of bootlegged GP connections will immediately void the warranty of the genuine GP products** *(drill pipe, HWDP, drill collars and accessories)* if genuine connections have been run with "bootleg" connections.
>
> GP's licensees are not authorized to engage in converting bootlegged connections labeled as our connections by non-licensed facilities or claimed to be interchangeable with GP's connections. They cannot produce "bootleg" connections of the same basic design as GP connections now and for several years after the termination of their license agreement.
>
> Accordingly, regardless of third party claims of "interchangeability" with GP's connections, we advise that the technical inadequacies of the "interchangeability" testing procedures, the potential lack of proper engineering input for the "bootleg" connections and the potential for operational safety risks in using the "bootleg" connections, make using "bootleg" connections a high-risk option for customers. GP highly recommends that customers use GP manufactured (or GP licensed) products for their drilling needs. If you have any questions regarding the authenticity of a licensee, please refer to the GP2Go™ app or from the licensee locator on the NOV website or contact a GP representative.

**69.** Despite these formal and informal warnings from NOV, NOV later learned Black Diamond did not stop deceiving customers and infringing upon NOV's XT® trademark. In fact, NOV later learned Black Diamond's infringement became more brazen, more dangerous, and more costly, as explained *infra*.

**70.** Black Diamond's deception and infringement was not harmless. Technical specifications for EVRDRL connections and XT® connections are different. Like the

excerpt of Black Diamond Drill Performance Sheet above, customers rely on the data therein for – among other things – make-up torque, which determines how the drill pipe is connected and assembled on the rig floor to form a drill string. Customers deceived into believing they are using drill pipe with an XT® connection that was ***actually*** EVRDRL or cut to an EVERDRL connection may use the wrong make-up torques when assembling the drill string. Improperly made-up drill string can have catastrophic consequences for those on the rig floor, which likely occurred on October 5, 2022, in Grady County, Oklahoma.

**The *Snider* Litigation**

**71.** Kaiser-Francis Oil Company ("Kaiser-Francis") was the operator of the Pritchard 17-8 #2HX oil and gas well (the "Well"), located in Grady County, Oklahoma.

**72.** Kaiser-Francis hired Cactus Drill Company, LLC ("Cactus") to drill the Well.

**73.** Cactus supplied Cactus Drilling Rig No. 154 (the "Rig") to Kaiser-Francis to drill the Well, which is pictured below:



**74.** On or about September 20, 2022, Black Diamond supplied 613 joints of drill-pipe to Kaiser-Francis for use on the Rig to drill the Well.

**75.** Kaiser-Francis had requested that Black Diamond supply drill pipe with XT®-39 connections. In turn, Jeb Hunt provided the following quote to Kaiser-Francis:

**From:** Jeb Hunt
**To:** Dj.salter@outlook.com
**Subject:** Black Diamond 4" XT-39 DP Quote

---

**Gents,**
**Here is the quote for 4" XT-39 drill pipe, hwdp and tools. Please note the terms you requested regarding standby when 4" isn't not being used.**
**Kaiser Francis**
**Mr. DJ Salter & Mr. Curt Jones**
**19,300" 4" OD 14.00# R-2 S-135 Drill Pipe w/ XT-39 Conns**
**30- 4" OD Hevi-Wate Drill Pipe w/ XT-39 Conns**
**Unlimited handling tools and subs (includes two of each tool or sub requested)**

**(DAY RATE WILL BEGIN ONCE PIPE IS PICKED UP AND STOP ONCE PIPE IS LAID DOWN)**
**(BLACK DIAMOND WILL NOT CHARGE A MINIMUM OR STANDBY WHEN 4" DRILL PIPE IS NOT BEING USED)**

**Recut- $175 per conn.**
**Reface- $60 per conn.**

**Inspection**

**Drill pipe- (CAT-4 plus blacklight)- $42 per joint**

**Heviwate- CAT 3-5 ($75 per joint)**

**——————————————-**
**($1775 per day)**

Thanks,

Jeb Hunt
Sales Rep. West Texas
Black Diamond
M: 405-637-8204
O: 432-689-0076
3510 North CR 1148
Midland, TX 79705

**76.** When questioned about the quote provided to Kaiser-Francis, Mr. Hunt said:

Q: And as you went to provide Mr. Salter[11] a quote, you referred to it as XT39, right?

A: Yes, sir.

Q: Which is what you were taught to do by Black Diamond?

A: Yes.

Q: Did you ever have a conversation with Mr. Salter where you laid it out in plain English and you explained to him that EVRDRL 3.90 is a relatively new product that has been developed and scientists have determined that it is interchangeable with a tradename product of Grant Prideco called XT39? Did you ever have a conversation like that with Salter?

A: No, sir.

Q: Okay. You just told him, per your training, that this was XT39 eXtreme torque joint connection?

A: Yes, sir, just like listed on the spec sheet.

*See* Depo. Tr. of J. Hunt at p. 105:2-18 (the *Snider* Litigation).

**77.** According to Black Diamond Delivery Ticket Assembly No. 16493 (the "DTA"), the drill pipe supplied by Black Diamond for use on the Rig at the Well came with "XT-39 ***Type*** Conns.,"[12] and ***not*** XT®-39, as excerpted from the DTA below:

| LN NO | TAX Y/N | Qty | Serial # | Description |
|---|---|---|---|---|
| 1 | Y | 613 | (19003') | 4" OD 14.00# S-135-RII-DRILLPIPE W/ XT-39 TYPE CONNS. |

[11] D.J. Salter, the Kaiser-Francis recipient of the email excerpted in Paragraph 75.

[12] "Conn" is oilfield short-hand for "connection."

**78.** NOV does not manufacture an "XT-39 ***Type***" connection, but rather an XT®-39 connection. "XT-39 ***Type***," which NOV does ***not*** manufacture, and XT®-39, which NOV ***does*** manufacture, are different, which Black Diamond admitted in the *Snider* Litigation. *See* Black Diamond Resp. to NOV Interrogatory No. 16 ("…generally an XT-39 type connection is a connection known in the industry as an XT-type because it is modeled off the XT design for which NOV formerly had a patent.").

**79.** Furthermore, Black Diamond explicitly referred to the EVRDRL 3.90 as an "XT39 ***Type***" connection in its own internal company materials.

**80.** Finally, Black Diamond admitted in the *Snider* Litigation that the subject tool joints "may have been cut/re-cut to an Evrdrl 3.90 connection[,]" which is consistent with the DTA, showing that Black Diamond supplied Kaiser-Francis with drill pipe containing an "XT-39 ***Type***" connection for use on the Rig at the Well. *See* Black Diamond Resp. to NOV Interrogatory No. 13 (in pertinent part stating that "to the extent the [drill pipe] connections were cut/re-cut, they may have been cut/re-cut to an Evrdrl 3.90 connection.").

**81.** On October 5, 2022, there was a downhole pressure loss while Cactus was drilling the Well for Kaiser-Francis.[13] Numerous Cactus employees were on the Rig that day, including Tanner Snider, a 19-year-old floor-hand. Tanner was dispatched to the Rig floor for trip-out operations following the downhole pressure loss.[14] While tripping out, the drill string "parted," or, separated, "in the box," *i.e.*, the location on the drill pipe where the

---

[13] A downhole pressure loss can denote a breach of the drill pipe.

[14] "Trip out operations" or "tripping out" describes the act of removing or pulling the drill string assembly out of the wellbore and up through the Rig floor.

tool joints screw together. Like a stretched rubber band that snaps, the uncontrolled drill string whipsawed in the hole, striking Tanner in the head and face, killing him.

**82.** On or about January 6, 2023, Tanner's parents filed a wrongful death action against Cactus, Kaiser-Francis, Black Diamond, and NOV (the *Snider* Litigation).

**83.** Later that year, Kaiser-Francis sued Black Diamond in associated litigation originally filed in Tulsa County District Court, Case No. CJ-2023-02397.[15] According to Kaiser-Francis, Black Diamond "misrepresented the actual joints of pipes that Kaiser-Francis thought it had rented and that [Black Diamond] delivered to the Well site."

**84.** NOV denied then, denies now, and forever denies in the future that it was liable for Tanner's death, particularly after the evidence developed in the *Snider* Litigation demonstrated Black Diamond deceptively supplied drill pipe containing "XT-39 ***Type***" connections, and not XT®-39, as requested by Kaiser-Francis. After the discovery of this and other exculpatory evidence, NOV was voluntarily dismissed on February 27, 2024.

**85.** Despite being dismissed, the marketplace confusion created by Black Diamond's infringement on NOV's XT® trademark resulted in NOV being wrongfully added as a defendant to the *Snider* Litigation. Being added to the *Snider* Litigation because of Black Diamond's deception and infringement caused NOV to suffer significant reputational harm, as well as incurring the cost and expense of defending itself in a wrongful death case.[16]

---

[15] Though ultimately transferred to Grady County (OK) District Court.

[16] On or about October 24, 2024, the *Snider* Litigation was dismissed with prejudice, presumably following a settlement between the remaining defendants, including Black Diamond, and Tanner's parents.

**86.** In sum, Black Diamond ignored earlier warnings from NOV about infringing on NOV's trademarks, including the XT® trademark (though NOV's earlier warning by way of letter was limited to Black Diamond's website as it existed in 2020). Instead, Black Diamond placed profits over people, deceiving oilfield customers like Kaiser-Francis and, by extension, Cactus, the company hired to drill the Well. Mr. Hunt testified that Cactus would never have known it was using EVRDRL 3.90 drill pipe, and not XT®-39:

> Q: But my question is, is – if any EVRDRL showed up there at the – at the site, is there any document, before it actually gets delivered at the site, for Cactus to know, this is EVRDRL, it's not XT39?
>
> A: No.

*See* J. Hunt Depo. Tr. at 200:3-7 (the *Snider* Litigation).

**87.** Ultimately, a young employee with Cactus lost his life because of a problem with the misrepresented drill string supplied by Black Diamond. Now is the time to stop Black Diamond's infringement on NOV's trademarks. Black Diamond's infringement was committed willfully and with malice, done expressly to deceive customers like Kaiser-Francis (and others, as shown above). Deception in the oilfield is deadly.

## III. CLAIMS

### Claim No. I – Infringement of Registered U.S. Trademark, 15 U.S.C. § 1114 (Black Diamond)

**88.** NOV repleads and incorporates in full paragraphs 1-87 above.

**89.** NOV owns a federal trademark registration for the mark "XT," Registration No. 2,466,236, in relation to, *inter alia*, "threaded metal drill pipe connections used on metal drill pipe for the drilling or oil and gas well and other boreholes."

Case 5:24-cv-01258-D Document 65-1 Filed 05/21/25 Page 35 of 48

**90.** Black Diamond places certain drill pipe into the stream of commerce with monikers deliberately suggesting such drill pipe contains tool joints with "XT-***Type***" threading connections. By using the moniker "XT-Type," customer confusion is not only likely, but has already occurred, as shown *supra*.

**91.** Black Diamond's unauthorized use of the XT® mark to promote, advertise, market, offer for sale, and/or sell its goods has caused and is likely to cause confusion, mistake, and deception of the public as to the identity and origin of Black Diamond's goods and services, or as to a connection or affiliation with NOV, or permission from NOV, that does not exist, causing irreparable harm to NOV for which there is no adequate remedy at law.

**92.** Despite Black Diamond's actual and constructive knowledge of NOV's ownership and prior use of the XT® mark, Black Diamond has continued to use the XT® mark without NOV's authorization or consent. Black Diamond's actions are deliberate and willful and have been done with the intention of trading upon the valuable goodwill built by NOV in association with the XT® mark.

**93.** NOV has no control over the quality of the goods provided by Black Diamond in association with its unauthorized use of the XT® mark. Because of the likelihood of confusion as to the source of Black Diamond's goods, NOV's valuable goodwill in the XT® mark is at the mercy of Black Diamond's unauthorized use of the XT® mark.

**94.** Therefore, Black Diamond's marketing and sale of drill pipe and drill pipe connections bearing the XT® mark constitutes infringement of U.S. Trademark

Registration No. 2,466,236 in violation of 15 U.S.C. § 1114.

**95.** Black Diamond's acts of trademark infringement have caused and, unless restrained, will continue to cause, great and irreparable injury to NOV and to the substantial consumer goodwill that NOV has engendered, in an amount that cannot be ascertained at this time, leaving NOV with no adequate remedy at law.

**96.** NOV has pled facts sufficient to meet the presumption of irreparable harm by Black Diamond's continued use of the "XT-Type" moniker when supplying drill pipe to customers in the oilfield. Accordingly, the Court should preliminarily and permanently enjoin Black Diamond from using the XT® mark in any of its documents, data, or customer-supplied packets or advertisements. *See* 15 U.S.C. § 1116(a).

**97.** Thus, NOV is entitled to, among other relief, injunctive relief against Black Diamond, restraining it from any further infringement of the XT® mark registered by U.S. Trademark Registration No. 2,466,236, as well as an award of actual damages, including Black Diamond's profits, enhanced damages and profits, reasonable attorney's fees, and costs of the action under 15 U.S.C. §§ 1116–1117, together with pre- and post-judgment interest.

**98.** For the avoidance of doubt, NOV is entitled to recover "such sum as the court shall find to be just, according to the circumstances." *See Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, No. 23-900, 605 U.S. ----, 2025 WL 608108 (U.S. Feb. 26, 2025) (citing 15 U.S.C. § 1117(a)).

**[Remainder of Page Intentionally Blank]**

Case 5:24-cv-01258-D Document 59 Filed 05/16/25 Page 37 of 48

## Claim No. II – Federal Unfair Competition and False Designation of Origin, 15 U.S.C. § 1125(a) (Black Diamond)

**99.** NOV repleads and incorporates in full paragraphs 1-98 above.

**100.** The aforesaid acts of Black Diamond constitute acts of unfair competition and passing and/or palming off in violation of the Lanham Act, 15 U.S.C. § 1125(a), impacting interstate commerce as Oklahoma and non-Oklahoma residents are customers of both NOV and Black Diamond.

**101.** Black Diamond's use in interstate commerce of the XT® mark uniquely associated by the consuming public with NOV has injured NOV's commercial interest in its sales and profits, its business, its business reputation, and its goodwill, in an amount of damages to be determined at trial.

**102.** Black Diamond's wrongful acts have been committed with intent to cause confusion and mistake, and with Black Diamond's knowledge of their wrongful nature, and are intentional and willful entitling NOV to enhanced damages.

**103.** Black Diamond's acts have caused and, unless and until such acts are restrained and enjoined by this Court, will continue to cause great and irreparable injury to NOV.

**104.** NOV has no adequate remedy at law for the wrongful acts of Black Diamond.

**105.** As a result of Black Diamond's actions, NOV has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**106.** Accordingly, NOV is entitled to, among other relief, injunctive relief against Black Diamond, restraining it from any further infringement of the XT® mark registered

by U.S. Trademark Registration No. 2,466,236, and an award of actual damages, including Black Diamond's profits, enhanced damages and profits, reasonable attorney's fees, and costs of the action under 15 U.S.C. §§ 1116–1117, together with pre- and post-judgment interest.

**Claim No. III – Federal False Advertising, 15 U.S.C. § 1125(a)**
**(Black Diamond)**

**107.** NOV repleads and incorporates in full paragraphs 1-106 above.

**108.** Black Diamond's actions alleged in these counterclaims constitute false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

**109.** Black Diamond has made literally false—as well as false and misleading—statements of fact related to origin of products. Such false statements include, but are not limited to, false and misleading statements of fact that are found on Black Diamond's data sheets, specifications, and other company materials and advertising communications, as will likely be shown after a reasonable opportunity for discovery.

**110.** Black Diamond's false statements of fact are commercial speech introduced into interstate commerce for the purpose of promoting Black Diamond's business associated with drill pipe and drill pipe connections for the oil and gas industry.

**111.** NOV and Black Diamond compete directly against each other for customers and potential customers of drill pipe and drill pipe connections in the oil and gas industry.

**112.** Black Diamond's false and misleading statements actually deceived or tended to deceive a substantial portion of the intended audience of potential customers and customers into believing, among other things, that Black Diamond's drill pipe and drill

pipe connections were associated, affiliated, or otherwise connected to NOV.

**113.** Black Diamond's false and misleading statements and consequential deception of its customers and potential customers have injured NOV's commercial interest in its sales and profits, its business, its business reputation, and its goodwill, in an amount of damages to be determined at trial.

**114.** Black Diamond's identified acts have caused and, unless and until such acts are restrained and enjoined by this Court, will continue to cause great irreparable injury to NOV.

**115.** NOV has no adequate remedy at law for the wrongful acts of Black Diamond.

**116.** Black Diamond has realized revenue and profits by virtue of its wrongful acts that they otherwise would not have obtained and to which they are not entitled.

**117.** NOV has suffered and will continue to suffer damages in an amount to be proven at trial.

**118.** Accordingly, NOV is entitled to, among other relief, injunctive relief against Black Diamond, as well as an award of actual damages, Black Diamond's profits, enhanced damages and profits, reasonable attorney's fees, and costs of the action under 15 U.S.C. §§ 1116–1117, together with pre- and post-judgment interest.

**Claim No. IV – Common-law Trademark Infringement**
**(Black Diamond)**

**119.** NOV repleads and incorporates in full paragraphs 1-118 above.

**120.** NOV is the valid owner of the XT® trademark.

**121.** Black Diamond places certain drill pipe into the stream of commerce with

monikers deliberately suggesting such drill pipe contains tool joints with "XT-***Type***" threading connections. By using the moniker "XT-Type," customer confusion is not only likely, but has already occurred, as shown above.

**122.** NOV has pled facts sufficient to meet the presumption of irreparable harm by Black Diamond's continued use of the "XT-Type" moniker when supplying drill pipe to customers in the oilfield. Accordingly, the Court should temporarily and permanently enjoin Black Diamond from using the XT® mark in any of its documents, data, or customer-supplied packets or advertisements. *See* 78 O.S. § 32.

**123.** Finally, and in addition to actual and punitive damages, NOV seeks an order from the Court disgorging Black Diamond of all profits earned by infringing on the XT® trademark held by NOV.

**Claim No. V – Violations of the Oklahoma Deceptive Trade Practices Act, 78 O.S, §§ 51 *et seq.* (Black Diamond)**

**124.** NOV repleads and incorporates in full paragraphs 1-123 above.

**125.** "XT®" meets the definition of "trademark" under the Oklahoma Deceptive Trade Practices Act (the "ODTPA"). *See* 78 O.S. § 52(10) ("'Trademark' means a mark used by a person to identify goods and to distinguish them from the goods of others[.]").

**126.** "Black Diamond" meet the definition of "person" under the ODTPA. *See* 78 O.S. § 52(8) ("'Person' means an individual, corporation, business trust, estate, trust, partnership, unincorporated association, two or more of any of the foregoing having a joint or common interest, or any other legal or commercial entity[.]").

**127.** Under the ODTPA, "[a] person engages in a deceptive trade practice when in

the course of business, vocation, or occupation, the person" commits one or more of the following acts: passes off goods or services as those of another; knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services; knowingly makes a false representation as to affiliation, connection, association with, or certification by another; knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, or quantities of goods or services or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith; and/or represents that goods or services are a particular standard, quality, or grade, or goods that a particular style or model, if they are another." *See* 78 O.S. § 53 (A)(1-3, 5, and 7).

**128.** Based on the Facts set forth, *supra*, Black Diamond is liable for willfully engaging in the foregoing deceptive trade practices.

**129.** Black Diamond willfully engaged in the foregoing deceptive trade practices with the intent to injure NOV and to destroy or substantially lessen competition in the drill pipe marketplace, damaging NOV in amount to be determined by a jury.

**130.** In addition to actual and punitive damages, NOV seeks an order from the Court temporarily and permanently enjoining Black Diamond from using the XT® mark in any of its documents, data, or customer-supplied packets or advertisements.

**131.** Finally, and in addition to the remedies already identified herein, NOV seeks an order from the Court awarding NOV all costs and attorney's fees incurred in connection herewith because Black Diamond willfully engaged in the foregoing deceptive trade practices. *See* 78 O.S. § 54(C).

**Claim No. VI – Unjust Enrichment**
**(Black Diamond and Basin)**

**132.** NOV repleads and incorporates in full paragraphs 1-131 above.

**133.** Black Diamond received an unjust benefit by using the "XT" moniker in certain of its documents, data, and customer-supplied packets.

**134.** Black Diamond knew it was receiving an unjust benefit by using the "XT" moniker in certain of its documents, data, and customer-supplied packets.

**135.** The benefit conferred on Black Diamond by using the "XT" moniker in certain of its documents, data, and customer-supplied packets was unjust because it was the result of willful deception by Black Diamond, designed to create oilfield customer confusion in the drill pipe marketplace.

**136.** NOV suffered a detriment because of the unjust benefit conferred on Black Diamond, including reputational harm, loss of market share, and actual damages.

**137.** Black Diamond's unjust conduct was not legally or equitably justified.

**138.** Basin, an active owner of Black Diamond, knew or should have known that Black Diamond received unjust benefits by using the "XT" moniker in certain of its documents, data, and customer-supplied packets, particularly because Mr. Biggerstaff is an executive with both Black Diamond and Basin, imputing his knowledge of the inequitable and unjust conduct to Basin. Rather than exercise appropriate corporate oversight over Black Diamond, Basin turned a blind eye, reaping and retaining the unjust benefits flowing from Black Diamond's inequitable conduct, which was at the expense of NOV.

**139.** Furthermore, Basin avoided having to deploy capital to Black Diamond for

either **(i)** research and development, as Black Diamond tried to bootleg NOV's proprietary technology instead, or **(ii)** advertising and marketing, as Black Diamond instructed its sales staff to sell its bootlegged connection as XT®, negating the need for such expenses. By avoiding capital deployment for these traditional corporate expenses, Basin was unjustly enriched.

**140.** NOV seeks an order from the Court impressing a constructive trust on all revenue and materials, including bootlegged drill pipe already in the oilfield, received or held by the Defendants because of the unjust conduct described herein.

**Claim No. VII – Piercing the Corporate Veil/Alter Ego Liability (Basin)**

**141.** NOV repleads and incorporates in full paragraphs 1-140 above.

**142.** Black Diamond is a mere instrumentality of Basin, its parent. Specifically, **(1)** Basin owns a majority of Black Diamond's stock; **(2)** Chris Biggerstaff, the President of Black Diamond, is also on the Executive Management Team for Basin; **(3)** Basin provides and/or arranges financing to Black Diamond, either directly, indirectly through affiliates like Basin Finance and/or Basin Industries, or through Basin's third party lending relationships; **(4)** upon information and belief, Black Diamond is undercapitalized and/or underinsured, particularly with respect to the claims asserted herein by NOV, largely because Basin deliberately charges Black Diamond costs, management fees, and intercompany financing charges that are commercially unreasonable and not negotiated at arm's length, depleting Black Diamond's capitalization and corresponding equity

position;[17] **(5)** upon information and belief, Basin pays the salaries, expenses, and/or losses of Black Diamond, either directly or indirectly through an affiliate called Basin Finance; **(6)** Black Diamond is considered an affiliate, or "portfolio" company of Basin; and **(7)** the officers and directors of Black Diamond are required to follow the directives of Basin, who – by design – always compromises a majority vote of the Board. Finally, but critically, and specific to this action, Basin has used and organized Black Diamond as a commercial vehicle to **(i)** infringe upon the protected XT® trademark of NOV, and **(ii)** deceive oil and gas companies into believing that Black Diamond's bootlegged competitor product was "interchangeable" with NOV's superior product, creating confusion in the associated marketplace. Unless Basin's separate existence is disregarded, Basin's inequitable conduct will be rewarded and NOV's rights will not be protected, resulting in substantial injustice.

**143.** Based upon the foregoing, the corporate veil between Black Diamond and Basin should be pierced, making Basin liable for the misconduct of Black Diamond, its alter ego.

**Claim No. VIII – Civil Conspiracy**
**(Black Diamond and Basin)**

**144.** NOV repleads and incorporates in full paragraphs 1-143 above.

**145.** Black Diamond and Basin conspired to develop EVRDRL after the XT® patent expired for the purpose of subsequently marketing the same as "XT" or "XT type," and making associated false claims of interchangeability with XT® to customers in the oil

17 [redacted]

and gas industry.

**146.** The objectives of Black Diamond and Basin's conspiracy were agreed upon and acknowledged by both, including the methods such scheme would be implemented, starting with the hiring of Mr. Jack Smith[18] to help "design" EVRDRL and continuing with the retention of engineers like Nels Wickander[19] as well as Fearnley Proctor, Inc.[20] who both, using junk science, sold Black Diamond biased and false engineering reports concerning the alleged interchangeability of EVRDRL and XT®.

**147.** These objectives resulted in the infringement of XT® mark held by NOV as well as associated customer confusion, including confusion caused by the false claims of "interchangeability" between EVRDRL and XT®, making both objectives unlawful.

**148.** As a direct and proximate cause of the foregoing, NOV was harmed.

**Claim No. IX – Negligence**
**(Basin)**

**149.** NOV repleads and incorporates in full paragraphs 1-148 above.

**150.** By and through certain of the affirmative actions described herein, as well as other affirmative actions to be uncovered during discovery, Basin created duties to third parties like NOV to ensure that its subsidiary, Black Diamond, refrained from implementing business schemes that would result in **(i)** the infringement of the XT® mark

---

[18] The former NOV/Grant Prideco employee who helped patent XT®.

[19] ***Another*** former NOV employee.

[20] An international engineering firm specializing in, among other things, selling biased engineering reports to unscrupulous outfits like Black Diamond, whose business model is to rip off the hard-earned goodwill of companies like NOV.

held by NOV, or – relatedly – **(ii)** false claims of interchangeability between EVRDRL and XT® that were made by Black Diamond.

**151.** Basin breached these duties, which it affirmatively created, by negligently failing to supervise Black Diamond, as shown herein.

**152.** As a direct and proximate cause of Basin's negligence, NOV was harmed.

## IV. PRAYER FOR RELIEF

**153.** NOV repleads and incorporates in full paragraphs 1-152 above.

**154.** NOV seeks an award of punitive damages against the Defendants because the acts described herein were done willfully and with malice.

**155.** In punishing the Defendants, the jury should consider the factors set forth in 23 O.S. § 9.1(A)(1-7). By extension, robust discovery should be conducted over these factors.

**WHEREFORE**, above premises considered, Plaintiff prays for judgment against the Defendants in an amount exceeding $75,000.00; for injunctive relief, as set forth above; for disgorgement, as set forth above; for the recovery of "such sum as the court shall find to be just, under the circumstances" pursuant to 15 U.S.C. § 1117(a); for an order from the Court impressing a constructive trust, as described above; for enhanced and/or punitive damages pursuant to 15 U.S.C. § 1117 and/or 23 O.S. § 9.1, *et seq*.; for all costs and attorney's fees incurred in connection herewith, as permitted by federal and state law; pre- and post-judgment interest; and for all further relief deemed just and equitable by the Court.

Respectfully submitted by:
**RYAN WHALEY, PLLC**

*/s/ Matthew K. Felty*
Phillip G. Whaley, OBA No. 13371
Evan W. Talley, OBA No. 22923
Matthew K. Felty, OBA No. 31057
Jim V. John, OBA No. 33928
Jacob Oliphant, OBA No. 34748
400 North Walnut Avenue
Oklahoma City, OK 73104
(405) 239-6040 (Telephone)
(405) 239-6766 (Facsimile)
pwhaley@ryanwhaley.com
etalley@ryanwhaley.com
mfelty@ryanwhaley.com
jjohn@ryanwhaley.com
joliphant@ryanwhaley.com

**ATTORNEYS FOR NATIONAL OILWELL VARCO, L.P.**

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on the 21st of May, 2025, a true and correct copy of the foregoing *National Oilwell Varco, L.P.'s Second Amended Complaint* was electronically served on the following counsel of record and CM/ECF registrants:

Michael J. LaBrie, Esq.
Zachary A.P. Oubre, Esq.
Zachary L. Neighbors, Esq.
**MCAFEE & TAFT, P.C.**
8th Floor, Two Leadership Square
211 N. Robinson Ave.
Oklahoma City, OK 73102
mike.labrie@mcafeetaft.com
zach.oubre@mcafeetaft.com
zach.neighbors@mcafeetaft.com

**ATTORNEYS FOR DEFENDANT BLACK DIAMOND OILFIELD RENTALS, LLC**

*/s/ Matthew K. Felty*
Matthew K. Felty

**JURY TRIAL DEMANDED**

**ATTORNEYS' LIEN CLAIMED**