**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| NATIONAL OILWELL VARCO, L.P.,<br>a Delaware limited partnership,<br><br>Plaintiff,<br><br>v.<br><br>BLACK DIAMOND OILFIELD<br>RENTALS, LLC, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-24-1258-D |

**ORDER**

Before the Court is Defendants Basin Holdings, LLC, and Basin Energy, LLC's (the "Basin Defendants") Joint Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction and Failure to State a Claim [Doc. No. 141]. Plaintiff National Oilwell Varco, L.P. (NOV) filed a response [Doc. No. 153], and the Basin Defendants replied [Doc. No. 157]. The matter is fully briefed and at issue.

**BACKGROUND**

Plaintiff NOV manufactures oil and gas drill pipe and drill pipe connections under its eXtreme Torque ("XT") trademark. Grant Prideco designed XT drill pipe and connections with a "double shoulder" to eliminate a gap common in single-shoulder connections. Following a merger, NOV acquired Grant Prideco's XT patent and trademark. NOV's patent for the XT drill pipe and drill pipe connections expired in 2017.

Following the expiration of the XT patent, Defendant Black Diamond Oilfield Rentals, LLC ("Black Diamond") began offering its own double-shoulder connections, named

EVRDRL. Black Diamond referred to its EVRDRL connections as "XT-type," allegedly because the oil and gas industry had come to associate "XT" with a type of drill pipe, and not specifically with NOV's XT connections. Black Diamond alleges that it procured independent studies and certifications that found EVRDRL connections to be interchangeable and/or compatible with NOV's XT connections. NOV disputes any claim of interchangeability between its XT connections and Black Diamond's EVRDRL connections. NOV further disputes that XT has become a generic term; rather, NOV asserts that XT is well known in the oil and gas industry to refer exclusively to NOV's drill pipe and drill pipe connections.

In January 2023, both NOV and Black Diamond were named as defendants in *Snider v. Cactus Drilling Co., LLC, et al.*, Case No. CJ-2023-7 (District Court of Grady County, Oklahoma) (Snider Litigation). The Snider Litigation alleged that Tanner Snider lost his life on a drilling rig "when a drill pipe connection failed downhole during trip out operations." [Petition, at ¶ 1, Snider Litigation, CJ-2023-7 (Grady County District Court)].[1] The petition references "more than 600 joints of NOV 4" XT-39 14 ppf drill pipe," which was allegedly manufactured by NOV and provided by Black Diamond. *Id.* at ¶¶ 2, 16. On February 27, 2024, the Snider Litigation plaintiffs dismissed without prejudice their claims against NOV, and the Snider Litigation ultimately resolved by settlement in October of 2024.[2]

---

[1] The Court takes judicial notice of the Snider Litigation, which is publicly accessible via http://www.oscn.net (last accessed Sept. 29th, 2026).

[2] Snider Litigation OSCN Docket Sheet, https://www.oscn.net/dockets/GetCaseIn

On December 3, 2024, NOV filed this action. The operative complaint is the Third Amended Complaint [Doc. Nos. 80, 84], which includes as defendants Black Diamond, the Basin Defendants, and Precision Engineering Solutions, LLC (Precision).[3]

Basin Energy, a Delaware limited liability company with its principal place of business in New York, New York, is the majority owner of Black Diamond. Basin Holdings, a Delaware limited liability company with its principal place of business in New York, New York, in turn, is the majority owner of Basin Energy.

For its claims against the Basin Defendants, NOV contends that the Basin Defendants directed Black Diamond to exploit the Oklahoma oil and gas market. NOV asserts the following claims against the Basin Defendants: alter ego liability; unjust enrichment; civil conspiracy; violations of the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq*.); violations of the Oklahoma Uniform Trade Secrets Act (OKLA. STAT. tit. 78, § 85 *et seq*.); misappropriation of confidential and proprietary business information; unfair competition; and negligence.

Before the Court is the Basin Defendants' Joint Motion to Dismiss [Doc. No. 141], in which the Basin Defendants assert that the Court lacks personal jurisdiction over them and that NOV fails to state a claim under FED. R. CIV. P. 12(b)(6).[4]

---

(continued . . .) formation.aspx?db=grady&number=CJ-2023-7, (last accessed Sept. 29th, 2026).

[3] Defendants Wickander and Associates, Inc. and Jackie E. "Jack" Smith have been dismissed from this action. [Doc. Nos. 145, 146].

[4] The Basin Defendants also incorporate Black Diamond's argument that Black Diamond's claims are time-barred. For the same reasons as stated in the Court's Order [Doc.

**STANDARD OF DECISION**

NOV "bears the burden of establishing personal jurisdiction over [the] defendant." *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000); *see Dental Dynamics, LLC v. Jolly Dental Group, LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020). Where, as here, the issue is presented for decision on the basis of allegations and affidavits or written materials, NOV "need only make a prima facie showing that jurisdiction exists." *Intercon*, 205 F.3d at 1247 (internal quotation and citation omitted).

At this stage, the Court must accept "'as true all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiff['s] complaint'" and "resolve any factual disputes in the plaintiff's favor." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)). However, "even well-pleaded jurisdictional allegations are not accepted as true once they are controverted by affidavit." *Shrader*, 633 F.3d at 1248. When a moving defendant submits an affidavit based on personal knowledge, the plaintiff must show a dispute of fact "through specific averments, verified allegations, or other evidence" such as affidavits or other written materials. *Shrader*, 633 F.3d at 1248; *Dental Dynamics*, 946 F.3d at 1228.

"To show personal jurisdiction over a nonresident in a diversity action, [the plaintiff] must demonstrate that jurisdiction is proper under the laws of the forum state—in this case Oklahoma—and that the exercise of jurisdiction complies with the Due Process Clause of

(continued . . .) No. 161] on NOV's Motion to Dismiss [Doc. No. 91], the Court denies the Basin Defendants' incorporated motion on this basis.

the Fourteenth Amendment." *Dental Dynamics*, 946 F.3d at 1228. Under Oklahoma law, the personal jurisdiction inquiry is simply the due process analysis. *Id.* at 1229. The familiar due process standard requires "minimum contacts" between the defendant and the forum state and a finding that the exercise of jurisdiction comports with "fair play and substantial justice." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 297 (1980); *Intercon*, 205 F.3d at 1247.

## DISCUSSION

### I. Minimum Contacts

The minimum contacts standard may be satisfied by showing general or specific jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 261-62 (2017). General jurisdiction refers to a court's power to hear claims against a nonresident defendant whose "affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *See Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quoting *Goodyear*, 564 U.S. at 919).

NOV relies solely on specific jurisdiction in this case. Specific jurisdiction requires that "'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Bristol-Myers*, 582 U.S. at 262 (quoting *Daimler*, 571 U.S. at 127) (emphasis added in *Bristol-Myers*). Specific jurisdiction "requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' defendant's forum-related activities.'" *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King*, 471 U.S. at 472).

**A. Purposeful direction**

To show that the Basin Defendants purposefully directed their activities at Oklahoma, NOV must establish "three elements: (1) an intentional action; (2) expressly aimed at the forum state; and (3) with knowledge that the brunt of the injury would be felt in the forum state." *Dental Dynamics, LLC,* 946 F.3d at 1231. The Tenth Circuit "has followed the Supreme Court in requiring a particular focus by the defendant on the forum State to satisfy the purposeful-direction requirement." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 843 (10th Cir. 2020). "In addition, a plaintiff's injuries must 'arise out of [the] defendant's forum-related activities.'" *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1280 (10th Cir. 2016) (citation omitted).

Purposeful direction can be satisfied by showing a defendant's "continuing relationships with forum state residents," "deliberate exploitation of the forum state market," or "harmful effects in the forum state." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017).

In their joint motion to dismiss, the Basin Defendants argue that NOV has not met its burden to establish their minimum contacts with Oklahoma for purposes of specific jurisdiction. The Basin Defendants maintain that NOV fails to allege that they were involved with the design of the XT connections or that they marketed the XT connections to Oklahoma customers (or elsewhere).

In support, the Basin Defendants have provided an Affidavit of Edward Dougherty [Doc. No. 141-1], which includes the following statements by Mr. Dougherty, the Chief Financial Officer of Defendant Basin Holdings:

- Basin Holdings is a global holding company that sells no goods or services directly; its direct or indirect portfolio companies provide products and services to energy and industrial customers, in the United States and internationally, across seven sectors: equipment supply and distribution, drilling tools, production and completion tools, material handling, precision machining, power solutions, and specialty products;
- Basin Holdings is organized under the laws of Delaware, with its principal place of business in New York, New York;
- Basin Energy is a global holding company and its direct or indirect portfolio companies provide products and services to the oil and gas industries in the United States and internationally;
- Basin Energy is organized under the laws of Delaware and has its principal place of business in New York, New York;
- The Basin Defendants are not registered to do business in Oklahoma; do not maintain an office, telephone listing, or mailing address in Oklahoma; do not own, lease, or control any real or personal property or assets in Oklahoma; do not have any bank accounts in Oklahoma; do not assign or station any agents, employee(s), or other representatives to work in Oklahoma; and do not advertise any products or services in Oklahoma or otherwise solicit business from any individuals or entities in Oklahoma;
- In 2012, Basin Rentals, LP, the predecessor entity to Defendant Basin Energy, formed an independent subsidiary, Black Diamond, under the laws of Delaware, and Basin Energy directly or indirectly owns the majority of Black Diamond's stock;
- Black Diamond operates independently from the Basin Defendants and has maintained its separate corporate identity since its formation in 2012;
- Black Diamond maintains its own books and records; has separate bank accounts; enters into credit or loan agreements in its own name; has its own, constituted board of managers; and has

over 90 employees, including dedicated Black Diamond sales representatives;

- A portion of Black Diamond's payroll is administered at non-party Basin Management, LLC, which is organized and formed under the laws of Delaware and is majority owned by Basin Energy; and
- Chris Biggerstaff was listed on the "Management" page of Basin Holdings LLC's website solely in his capacity as the Co-Founder and President of Black Diamond and never exercised any management or executive role at Basin Holdings or Basin Energy.

*Id.* at ¶¶ 2-15].

Based on the foregoing, the Basin Defendants contend that NOV has failed to show that they purposefully directed their activities at Oklahoma and that NOV's injuries arise out of those forum-related activities.

In response, NOV contends:

- Defendant Basin Holdings markets Basin Energy on its website, basinholdings.com, as its "rental businesses," including subsidiary, Black Diamond, through which it rents oilfield equipment to customers throughout the United States;
- The Basin Defendants launched their drill pipe rental division (through Black Diamond) to exploit the Oklahoma market by supplying oilfield drill pipe to customers located in Oklahoma;
- That the Basin Defendants directed Black Diamond to develop EVRDRL to increase margins on drill pipe rentals and to avoid NOV's licensing fees for the XT connections;
- That the Basin Defendants paid for interchangeability testing to further Black Diamond's scheme to market the EVRDRL connections as XT connections;

- That the Basin Defendants knew or should have known that Black Diamond was passing the EVRDRL connections off as XT connections based upon the participation of Basin executives in reviewing promotional materials and marketing EVRDRL to international customers; and
- That the Basin Defendants knew or should have known that the brunt of NOV's injury would be felt in Oklahoma because Black Diamond maintained a physical office in Oklahoma and that Black Diamond supplied customers like Kaiser-Francis with EVRDRL connections.

[Doc. No. 154, at 8, 13, 18-19].

NOV's arguments as to the Basin Defendants' purposefully directing their activities at the forum state are focused primarily on the Basin Defendants' usage of Black Diamond as a subsidiary and as an extension of their businesses.[5] Therefore, the Court will focus its analysis on whether NOV can show that Black Diamond's minimum contacts with Oklahoma may be imputed to the Basin Defendants.[6] *See George v. Uponor Corp.,* 988 F. Supp. 2d 1056, 1064 (D. Minn. 2013) ("Plaintiffs are not arguing Uponor Corp. should be subject to specific jurisdiction because it is the head of a distribution network or otherwise ships or sells goods to Minnesota. Instead, Plaintiffs argue Uponor Corp. treats Uponor, Inc. as an extension of its business, and that Uponor, Inc. has used Uponor Corp.'s assets and designs to manufacture and sell the Components.").

---

[5] NOV's argument that the Basin Defendants are subject to personal jurisdiction here independent of an alter ego analysis, still relies predominately on the activities of Defendant Black Diamond. [Doc. No. 153, at 10-13].

[6] Black Diamond does not object to the Court having personal jurisdiction over it.

"Generally, a 'parent company has a separate corporate existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity.'" *Hamilton v. Water Whole Int'l Corp.,* No. CIV-04-1216-M, 2006 WL 1049591, at *2 (W.D. Okla. Apr. 19, 2006) (quoting *Benton v. Cameo Corp.,* 375 F.3d 1070, 1081 (10th Cir. 2004)). "However, if a subsidiary is an alter ego of the parent corporation, the companies are not treated separately, and for personal jurisdiction purposes, the acts and conduct of the subsidiary are imputed or attributed to the parent company." *Id.* (citing *Home-Stake Prod. Co. v. Talon Petrol., C.A.,* 907 F.2d 1012, 1020-1021 (10th Cir. 1990)).

To determine whether a subsidiary is an alter ego of its parent company, the Court considers the following factors:

> (1) the parent corporation owns all or most of the subsidiary's stock, (2) the corporations have common directors or officers, (3) the parent provides financing to its subsidiary, (4) the parent corporation subscribes to all the other's stock, (5) the subsidiary is grossly undercapitalized, (6) the parent pays the salaries, expenses or losses of the subsidiary, (7) almost all of the subsidiary's business is with the parent or the assets of the former were conveyed from the latter, (8) the parent refers to its subsidiary as a division or department, (9) the subsidiary's officers or directors follow directions from the parent corporation, and (10) legal formalities for keeping the entities separate and independent are not observed.

*Id.* (citing *Frazier v. Bryan Mem'l Hosp. Auth.,* 775 P.2d 281, 288 (Okla. 1989)). "In making this determination, the commonality of purpose between the corporations is also important." *Id.* (citing *Oliver v. Farmers Ins. Group of Cos.,* 941 P.2d 985, 987 (Okla. 1997)).

It is undisputed that Defendant Basin Holdings is the majority owner of Defendant Basin Energy, which in turn is the majority owner of Black Diamond. So, the first factor is met. For the second *Frazier* factor, NOV points to a single example, that Chris Biggerstaff

at one time served both as president of Black Diamond "and on the management team of Basin." [Doc. No. 20, at 33].

As to the third, fourth, and fifth factors, NOV points to a loan received by Black Diamond from Basin Rentals, Inc., shortly after it was formed and "[a]fter several months of gross undercapitalization." [Doc. No. 154, at 20 (citing Ex. 1, LLC Agreement)]. And, further, that Black Diamond's total equity was negative from at least 2018 to 2023. *Id.* at 21.

For the sixth factor, NOV asserts that "Basin routinely pays the salaries, expenses, and/or losses" of Black Diamond "directly or indirectly through affiliates, specifically including bills related to the XT® scheme. . . ." *Id.* The Dougherty Affidavit states that, "[a] portion of Black Diamond's payroll is administered at non-party Basin Management, LLC, which is organized and formed under the laws of Delaware and majority owned by Basin Energy." [Doc. No. 141-1, at 3].[7]

---

[7] NOV also cites ¶ 53 of the Third Amended Complaint to support its assertion that the Basin Defendants paid the salaries of Black Diamond's officers and managers. The referenced paragraph cites the Bates number of the documents (Black Diamond 38902; Black Diamond 39392; NOV_CIV_24_1258_00008958; NOV_CIV-24_1258_00008971; Black Diamond_046453), rather than the page number of the documents' filing in the ECF system. [Doc. No. 84, at 20-21]. And the referenced documents are not attached to NOV's Third Amended Complaint or NOV's response to the Basin Defendants' Motion to Dismiss. Thus, the Court has been unable to locate the relied upon documents. And "'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record.'" *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quoting *Downes v. Beach,* 587 F.2d 469, 472 (10th Cir. 1978)); *McKinzy v. I.R.S.,* , 897 (10th Cir. 2010) (unpublished) ("'Judges are not like pigs, hunting for truffles buried in briefs.'" (quoting *Gross v. Burggraf Constr. Co*., 53 F.3d 1531, 1546 (10th Cir. 1995)).

For the seventh factor, NOV relies upon a single example, that is, that Black Diamond purchased a drill pipe for rent using a loan from Basin Holdings.

For the eight factor, NOV cites Basin Holdings' website, which refers to Black Diamond as a division, and a 2014 annual report, referring to Black Diamond as a division of non-party, Basin Services, which is a division of Basin Holdings. NOV additionally cites a 2017 Basin Strategic Review, discussing Black Diamond's value as a company asset.

For the ninth factor, NOV cites Black Diamond's amended LLC agreement, an Affidavit of Adam Gibson,[8] the Basin Holdings' Code of Conduct, and Black Diamond's Employee Handbook. Gibson states that "[f]rom time to time, Black Diamond and Basin conducted in-person manager meetings that were usually held in Houston, Texas" and "had weekly meetings, which were usually remote using the Microsoft Teams platform." [Doc. No. 153-9, at 3]. The Amended LLC agreement states that Basin Holdings has "the right to appoint, and to remove five (5) Managers," "the 'Basin Managers,'" of Black Diamond, "who may be designated by Basin at any time, from time to time, after the execution of [the LLC] Agreement." [Doc. No. 154-2, at 6]. There are nine managers of Black Diamond per the Agreement, and Basin Holdings is required to designate "one of the Basin Managers to serve as chairman of the Management Board." *Id.* Black Diamond's Management Board also must approve any action by Black Diamond "that would require approval of the board of directors or stockholders of a corporation formed under Delaware law." *Id.* And NOV

---

[8] Gibson is a former employee of Black Diamond. [Doc. No. 153-9, at 1].

alleges that Basin Holdings' Code of Conduct and Black Diamond's Employee Handbook were prepared by Basin Holdings' Vice President of Human Relations.

For the tenth and final factor, NOV states that Black Diamond has not produced minutes of its corporate board meetings, but notes that EVRDRL was a topic at Basin's 2017 Strategic Review Conference.

After careful consideration of the arguments and evidentiary materials submitted by the parties, the Court finds that NOV fails to make a prima facie showing that the Court has specific personal jurisdiction over the Basin Defendants. The evidentiary materials show that Defendant Basin Holdings is a holding company with Black Diamond as one of its many subsidiaries, but not that "[D]efendants failed to maintain the 'separation of the two entities[.]'" *Stockton v. CNH Indus. Am., LLC,* No. 16-CV-464-GKF-PJC, 2017 WL 11493759, at *6 (N.D. Okla. Jan. 18, 2017) (quoting *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358 (10th Cir. 1974)).

This Court has found personal jurisdiction exists over a parent corporation of a subsidiary where all the subsidiaries' directors were also directors of its parent corporation, and all its officers were also officers of its parent corporation. *Hamilton,* 2006 WL 1049591, at *2 ("Further, plaintiffs have submitted evidence that Floran and Floran U.S. have numerous common directors and officers. In fact, all of Floran US' directors are also directors of Floran, and all of Floran's officers are also officers of Floran US."). But NOV has not presented any evidence showing a similar level of management overlap between Black Diamond and the Basin Defendants. Instead, NOV relies on one example to support its contention that there are common directors and officers shared by Black Diamond, and

its parent corporations: that Chris Biggerstaff, at one time, during his tenure as Black Diamond's president was also listed as being part of Basin Holdings' management team.

Additionally, the evidence presented by NOV—that Defendant Basin Holdings' appoints a majority of Black Diamond's management board and the board's chairman—is not unusual enough to satisfy the "'plus' factor," that is normally present "[i]n those cases where personal jurisdiction over the parent has been found to exist." *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465-66 (1st Cir. 1990). "'[P]arents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent . . . ." *Stockton,* 2017 WL 11493759, at *6 (quoting *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537, 540 (7th Cir. 1998) (collecting cases)). Instead, the evidence presented by NOV is more akin to a parent corporation's normal supervision "on certain operational matters," not controlling the day-to-day operations of the subsidiary, Black Diamond. *Id.*

*Gilbert* is also instructive. *Gilbert v. Sec. Fin. Corp. of Okla., Inc.,* 152 P.3d 165, 174 (Okla. 2006). In *Gilbert,* the Oklahoma Supreme Court considered whether holding companies could be subject to personal jurisdiction in Oklahoma based on their subsidiaries' admitted contacts in Oklahoma. *Id.* at 174. The court considered evidence that the holding companies owned the Oklahoma subsidiaries' stock and had some directors in common with the Oklahoma subsidiaries; there was also evidence that the holding companies and subsidiaries filed consolidated income tax returns, and the holding companies executed a management agreement. *Id.* However, the Oklahoma Supreme Court still found that the evidence presented was insufficient to constitute the pervasive control required to

permit the exercise of personal jurisdiction over the holding companies under an alter-ego theory. *Id.*

For these reasons, the Court finds that NOV has failed to meet its burden to make a prima facie showing of the Basin Defendants' minimum contacts with Oklahoma on the basis of an alter ego theory.

**B. Conspiracy**

NOV also asserts that its civil conspiracy claim against the Basin Defendants can serve as an additional basis for personal jurisdiction over Defendants. [Doc. No. 151, at 30-31].

"[A] co-conspirator's presence within the forum might reasonably create the 'minimum contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum." *Melea, Ltd v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007). However, "for personal jurisdiction based on a conspiracy theory to exist, the plaintiff must offer more than bare allegations that a conspiracy existed, and must allege facts that would support a prima facie showing of a conspiracy." *Hart v. Salois*, 605 F. App'x 694, 700 (10th Cir. 2015). "[I]n addition to pleading a prima facie conspiracy, due process requires that a defendant also have minimum contacts with the forum." *Id.; see also Weldon v. Ramstad-Hvass,* 512 F. App'x 783, 789 (10th Cir. 2013) (unpublished) ("[A]llegations sufficient to support a prima facie showing of conspiracy do not *necessarily* establish jurisdiction over a nonresident co-conspirator.").

NOV raises a civil conspiracy claim against all Defendants. It alleges that Black Diamond and the Basin Defendants conspired to develop EVRDRL for the purpose of subsequently marketing EVRDRL as the "XT" or "XT type," which infringed upon the XT® trademark.

The Court finds that NOV's civil conspiracy claim cannot serve as the basis for exercising jurisdiction over the Basin Defendants because NOV fails to allege that the conspiracy and its object were directed at Oklahoma, and that substantial steps in furtherance of the conspiracy were taken in Oklahoma. *See Melea,* 511 F.3d at 1070 ("Where no injury related to the conspiracy occurred in Colorado, and [the defendant's] only Colorado-related action with regard to any purported conspiracy was to receive communications from Colorado, the basis for jurisdiction is slim.").

NOV asserts that the object of the conspiracy was the design and development of EVRDRL, and to pass off EVRDRL connections as XT connections to deceive customers in the oil and gas industry and unjustly profit from the hard-earned goodwill of NOV. But this does not show that the conspiracy or its object was specifically directed at Oklahoma. And given that the Basin Defendants do not have a physical presence, reside, or have their principal place of business in Oklahoma, NOV "has not established personal jurisdiction over [the Basin Defendants] through its allegations of conspiracy." *G.A. Resort Condo. Ass'n, Inc. v. ILG, LLC*, No. 19-CV-01870-RM-GPG, 2020 WL 5536361, at *6 (D. Colo. July 2, 2020) (finding no personal jurisdiction over parent corporations of subsidiary where plaintiff alleged conspiracy), *adopted,* 2020 WL 4364207 (D. Colo. July 30, 2020).

### C. Traditional Notions of Fair Play and Substantial Justice

As the Court has found that NOV has failed to establish the Basin Defendants' minimum contacts with the forum state, it will not address the issue of whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *See Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1299 n.1 (10th Cir. 1999) ("Because we conclude that [the plaintiff] has failed to establish that [the defendant] has minimum contacts with the [forum state], we need not proceed to the next step of the due process analysis—i.e., whether the exercise of personal jurisdiction over [the defendant] could offend 'traditional notions of fair play and substantial justice.'") (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cali.*, 480 U.S. 102, 113 (1987)).

## II. Dismissal or Transfer for Lack of Personal Jurisdiction

When a federal district court determines that it lacks personal jurisdiction, it "shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought." 28 U.S.C. § 1631.

Section 1631 "contain[s] the word 'shall,'" but the Tenth Circuit has "interpreted the phrase 'if it is in the interest of justice' to grant the district court discretion in making a decision to transfer an action or instead to dismiss the action without prejudice." *Trujillo v. Williams*, 465 F.3d 1210, 1222-23 (10th Cir. 2006). "Factors considered in deciding whether a transfer is in the interest of justice include [1] whether the claims would be time barred if filed anew in the proper forum, [2] whether the claims alleged are likely to have merit, and [3] whether the claims were filed in good faith or if, on the other hand, it was clear at the time of filing that the court lacked the requisite jurisdiction." *In re Cline*, 531

F.3d 1249, 1251 (10th Cir. 2008). "[W]here the court determines that it lacks jurisdiction and the interests of justice require transfer rather than dismissal, '[t]he correct course . . . [is] to transfer the action pursuant to [§ 1631].'" *Trujillo*, 465 F.3d at 1223 (alterations in original) (quoting *Ross v. Colo. Outward Bound Sch., Inc.*, 822 F.2d 1524, 1527 (10th Cir. 1987)).

The Tenth Circuit has recognized that where there is a "patent impediment to [transfer under Section 1631]" such as multiple sets of defendants residing in different states, "there [is] no single court to which the action could be transferred with any assurance that jurisdiction would [be] proper." *Shrader v. Biddinger*, 633 F.3d 1235, 1249 (10th Cir. 2011). In *Shrader,* the Tenth Circuit further noted that it was "aware of no authority even permitting, much less requiring, a district court to unilaterally split up an action and transfer the resultant components to diverse jurisdictions under the auspices of § 1631." *Id*. at 1249-50. Accordingly, "'[d]istrict courts within the Tenth Circuit consistently have applied *Shrader* to find that dismissal, rather than transfer, is appropriate where the lawsuit 'features multiple defendants residing in different states, [as] there [is] no single court to which the action could be transferred with any assurance that jurisdiction would have been proper.'" *King v. United States,* No. 21-CV-01421-CMA-NYW, 2022 WL 889173, at *4 (D. Colo. Mar. 25, 2022) (quoting *Kennedy v. Mountainside Pizza, Inc.*, No. 19-CV-01199-CMA-STV, 2020 WL 4454897, at *7 (D. Colo. May 14, 2020) (collecting cases), *adopted,* 2020 WL 4448771 (D. Colo. Aug. 3, 2020)). Therefore, the Court finds that NOV's claims against the Basin Defendants "should be dismissed without prejudice rather than 'unilaterally split[ting] up [the] action and transfer[ing] the resultant components to

[multiple,] diverse jurisdictions.'" *Kennedy,* 2020 WL 4454897, at *8 (quoting *Shrader,* 633 F.3d at 1250).

**CONCLUSION**

For these reasons, the Basin Defendants' Joint Motion to Dismiss Third Amended Complaint and Brief in Support [Doc. No. 141] is **GRANTED** in part.[9]

**IT IS SO ORDERED** this 29th day of September, 2026.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

[9] Because the Court has determined it lacks personal jurisdiction over the Basin Defendants, the Court need not address Defendants' remaining argument that NOV's claims against them should be dismissed for failure to state a claim under FED. R. CIV. 12(b)(6).